SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## Robert Smith v. Millville Rescue Squad (074685) (A-19-14)

**Argued December 1, 2015 – Decided June 21, 2016**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, the Court considers whether the prohibition in the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42, against discrimination based on marital status extends to a person who has separated from their spouse and is in the process of divorce. The Court then determines whether, on defendant's motion for an involuntary dismissal of the complaint, plaintiff presented a prima facie case of discrimination under the LAD where he alleged that defendant terminated his employment based on his separation and impending divorce from his co-employee wife, after he began an extra-marital affair with a colleague.

In February 2006, plaintiff Robert Smith, who was then employed as director of operations of defendant Millville Rescue Squad, was terminated from employment. This occurred shortly after he informed his supervisor that he was engaged in an affair with a volunteer worker, and that he and his wife, who also worked for the rescue squad, were separated and about to commence divorce proceedings.

Plaintiff testified that, when he informed his supervisor about the affair, the supervisor stated that he could not promise that it would not affect plaintiff's job. At a subsequent meeting in February 2006, plaintiff's supervisor stated that he believed that plaintiff and his wife would have an "ugly divorce." The supervisor further stated that he had to take the matter to the rescue squad's board. At the meeting, the board decided to terminate plaintiff's employment. The minutes of the meeting referred to a corporate restructuring, plaintiff's poor performance for some time, and the failure of efforts to remediate plaintiff's performance, as grounds for the termination. Defendant terminated plaintiff's employment on the following day.

Plaintiff commenced suit against the rescue squad and his supervisor, asserting claims under the LAD and the State Constitution for wrongful discrimination on the basis of sex and marital status, and common law wrongful discharge. Plaintiff testified at trial to the statements that his supervisor had made after plaintiff told him about his separation and impending divorce. Plaintiff also testified that he was never subject to formal discipline, and that he was promoted twice and had received annual raises. Plaintiff further testified that he and his wife obtained a divorce several months after they commenced proceedings, the divorce was amicable, and he continues to have a good relationship with his former wife.

At the conclusion of plaintiff's case, the court granted defendant's motion for an involuntary dismissal. On plaintiff's claim of marital-status discrimination under the LAD, the court found that plaintiff had failed to present evidence that he was terminated because he was either married or unmarried, or because he was having an affair, or any evidence that employees were treated differently based on their marital status. The court found that plaintiff's proofs showed that he was terminated because management was concerned about the likelihood of an acrimonious divorce, which the court held did not give rise to a marital-status discrimination claim.

The Appellate Division reversed the dismissal of plaintiff's marital-status discrimination claim. The panel interpreted "marital status" to include the states of being separated and involved in divorce proceedings. The panel determined that, based on the comments by plaintiff's supervisor, plaintiff presented evidence that he was terminated based on negative stereotypes that defendant held about divorcing employees, and that plaintiff had established a prima facie case of discrimination. This Court granted certification. 220 N.J. 42 (2014).

**HELD:** The protection that the LAD affords against discrimination based on marital status is not limited to the state of being single or married. The LAD also prohibits discrimination against a prospective or current employee based on their status as separated, in the process of divorce, or divorced. The evidence that plaintiff presented at trial

suggests that defendant's animus toward divorcing persons, based on stereotypical views, affected the decision to terminate plaintiff's employment, and therefore created an inference of discrimination due to defendant's marital status. The trial court erred in finding that plaintiff failed to establish a prima facie case of marital-status discrimination in employment under the LAD.

1. The LAD declares certain actions, including the termination of an employee, to constitute an unlawful employment practice if based on factors such as race, sex, marital status, national origin, and age. "Marital status" is not defined in the Act, and there is no legislative history which identifies the scope and boundaries of the employee protection which this term affords. Therefore, the Court must identify and implement the legislative intent of the LAD. (pp. 14-18)

2. The stated purpose and goals of the LAD strongly suggest that the Court should consider marital status to mean more than the state of being single or married. A broader interpretation is consistent with the remedial purpose of the statute, and advances its goal of eradicating discrimination in the workplace. A liberal interpretation would also prevent employers from resorting to invidious stereotypes to justify the discharge of employees who never married, or who are engaged, separated, involved in divorce litigation, or recently widowed. (pp. 18-20)

3. "Marital status" should be interpreted to include individuals who are single or married, and those who are in transition from one of these states to another. This interpretation covers basic decisions that an employee makes during his or her lifetime such as those involved in marriage or divorce, and an individual should not fear that such events will also trigger a loss of employment, or a promised promotion. This interpretation does not interfere with an employer's legitimate business judgment and policies regarding its workforce, including the ability to discipline or terminate an employee who is inattentive to his job responsibilities. Our interpretation likewise does not disturb settled precedent harmonizing the LAD and anti-nepotism policies. Our construction of the Act prevents an employer from resorting to stereotypes in its assessment of a potential or existing employee that bear no relation to the employee's performance in the workplace. (pp. 22-23)

4. An employee may attempt to prove a violation of the LAD through either direct or circumstantial evidence of discrimination. If the claim is based on circumstantial evidence, the plaintiff must prove, by a preponderance of the evidence, the four elements of the test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The employer can seek to rebut the presumption of discrimination with evidence of a legitimate, non-discriminatory reason for the action taken. The burden then shifts to the employee to show that the employer's proffered reason was a pretext for discrimination. (pp. 24-27)

5. Upon review of a motion for involuntary dismissal under Rule 4:37-2(b), or a motion for judgment under Rule 4:40-1, the Court applies the same standard that a trial court must use. Under that standard, if, accepting as true all evidence which supports the position of the opponent of the motion, and according him all reasonable inferences from the evidence, reasonable minds could differ, the motion must be denied. The motion should be granted only if no rational juror could conclude that plaintiff marshalled sufficient proof to demonstrate a cause of action. (pp. 28-29)

6. Under this standard, plaintiff presented a prima facie case of marital-status discrimination by direct evidence. The facts that plaintiff asserted demonstrate that he was discharged based, in significant part, on his employer's stereotypical view of divorcing parties, and the presumed impact that plaintiff's divorce would have on the work performance of plaintiff and others. The evidence further demonstrated that defendants were not enforcing an anti-nepotism policy because they had permitted plaintiff and his wife to work together for a number of years. The trial court improperly utilized the McDonnell-Douglas test to assess plaintiff's proofs, because it is applicable only where the claim is based on circumstantial evidence. (pp. 29-31)

The judgment of the Appellate Division is **AFFIRMED**.

**CHIEF JUSTICE RABNER, and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON, join in JUDGE CUFF's opinion. JUSTICE FERNANDEZ-VINA did not** participate**.**

2

ROBERT SMITH,

    Plaintiff-Respondent,

       v.

MILLVILLE RESCUE SQUAD and
JOHN REDDEN,

    Defendants-Appellants.


         Argued December 1, 2015 – Decided June 21, 2016

         On certification to the Superior Court,
         Appellate Division.

         Steven Gerber argued the cause for
         appellants (Gonzalez Saggio & Harlan,
         attorneys; Mr. Gerber, Mary P. Gallagher,
         and Ola A. Nunez, on the briefs).

         Mario A. Iavicoli argued the cause for
         respondent.

         Jeanne M. LoCicero argued the cause for
         amicus curiae American Civil Liberties Union
         of New Jersey (Edward L. Barocas, Legal
         Director, attorney; Ms. LoCicero, Mr.
         Barocas, and Alexander R. Shalom, on the
         brief).

    JUDGE CUFF (temporarily assigned) delivered the opinion of

the Court.

    This appeal addresses the scope of the marital status

protection afforded to employees by the Law Against

Discrimination (LAD), N.J.S.A. 10:5-1 to -42. In this appeal,

1

plaintiff Robert Smith was terminated from his position as operations director of a rescue squad soon after he revealed that he and his co-employee wife were separated, would not reconcile, and were about to initiate divorce proceedings. We hold, as did the Appellate Division, that marital status is not limited to the state of being single or married. Rather, the LAD also protects all employees who have declared that they will marry, have separated from a spouse, have initiated divorce proceedings, or have obtained a divorce from discrimination in the workplace.

The LAD prohibits an employer from imposing conditions of employment that have no relationship to the tasks assigned to and expected of an employee. It also prohibits an employer from resorting to stereotypes to discipline, block from advancement, or terminate an employee due to a life decision, such as deciding to marry or divorce. The LAD does not bar an employer from making a legitimate business decision to discipline or terminate an employee whose personal life decisions, such as a marital separation or divorce, have disrupted the workplace or hindered the ability of the employee or others to do their job. However, an employer may not assume, based on invidious stereotypes, that an employee will be disruptive or ineffective simply because of life decisions such as a marriage or divorce.

2

We also determine that plaintiff presented sufficient evidence from which a reasonable jury could find that the employer harbored discriminatory animus against divorcing employees and that this animus bore directly on the decision to terminate plaintiff's employment. The trial court therefore erred when it dismissed the complaint at the close of plaintiff's case. We therefore affirm the judgment of the Appellate Division and remand the matter to the trial court for further proceedings.

I.

We present the facts adduced at trial "accepting as true all the evidence which supports [plaintiff's position] and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom," Verdicchio v. Ricca, 179 N.J. 1, 30 (2004) (citation omitted), as we must, given the procedural posture of this case.

Plaintiff Robert Smith is a certified emergency medical technician and paramedic. He was associated with defendant Millville Rescue Squad (MRS), which provides medical transportation and rescue services, for seventeen years, initially as a volunteer member. Plaintiff assumed a paid position in January 1996. At the time of his termination in February 2006, plaintiff served as Director of Operations and had held that position since June 1998. Plaintiff's direct

3

supervisor was co-defendant John Redden, MRS's Chief Executive Officer. Plaintiff's wife at the time, Mary, was also employed by MRS, as were her mother and two sisters.

In early 2005, plaintiff commenced an extramarital affair with an MRS volunteer, who was supervised directly by plaintiff. In June 2005, Mary learned of plaintiff's affair and reported it to Redden. Shortly thereafter, plaintiff informed Redden of the affair. During that conversation, plaintiff testified that Redden told him that he could not promise that the affair would not affect plaintiff's job. According to plaintiff, on the subject of plaintiff's continuing employment with MRS, Redden stated, "All depends on how it shakes down."

The MRS volunteer left MRS on June 27, 2005, but the affair continued, leading to irreconcilable discord between plaintiff and Mary. On January 1, 2006, plaintiff moved out of the marital home. On January 2, 2006, plaintiff informed Redden that his marriage to Mary had collapsed. According to plaintiff's testimony, Redden thanked plaintiff for keeping him informed and asked to be notified of any developments regarding his marital status.

On February 16, 2006, plaintiff and Redden met again. According to plaintiff's testimony, Redden told plaintiff that he did not think there was any chance of reconciliation between plaintiff and Mary and that he believed there would be an "ugly

4

divorce." Plaintiff testified that Redden informed him that if there had been even the slightest chance of reconciliation, Redden would not have to take the issue to the MRS Board of Directors (the Board). According to plaintiff, Redden stated, "You had eight months to make things right with your wife." Plaintiff also testified that Redden said he understood that plaintiff had "to do what's best for me." Redden informed plaintiff that he had to take the matter to the Board.

Plaintiff testified that Redden also indicated that he should not have met with plaintiff and that he was only supposed to meet with plaintiff the next day to terminate his employment. Redden informed plaintiff that if anyone learned that they had met, he would deny it.

Plaintiff asked Redden if he was being terminated because he was the one who had the affair. Redden replied that if he had to terminate plaintiff, it would be for one of four reasons. Two of those reasons were elimination of plaintiff's job because of restructuring and "poor work performance[.]" Plaintiff testified that he could not recall the other two reasons.

Later, plaintiff learned that the Board held a meeting on February 7, 2006, which was attended by Redden. According to meeting minutes, the Board decided to terminate plaintiff at that meeting. The minutes contain discussions of an "operational restructuring" that would negatively impact

5

plaintiff's position.  The minutes include a note that plaintiff's "work performance has been very poor for some time," and that "all efforts to remediate have failed."  The minutes also state that "Redden feels there are no other options available, and [plaintiff] must be terminated.  The board members told Chief Redden to seek advice of legal counsel before taking this action and proceed as necessary with his termination."

When Redden informed plaintiff that the Board had decided to terminate plaintiff and that the decision was final, Redden gave plaintiff one day to resign before being fired.  Plaintiff said he would resign and left the meeting.  Thereafter, plaintiff decided not to resign, and he was fired the next day, February 17, 2006.

Plaintiff testified that the MRS Employee Information Manual (the Manual) provided that plaintiff was an "at will" employee who could resign or be terminated at any time with or without cause or notice.  The Manual also included a sexual harassment policy, but plaintiff testified that he did not believe that having a relationship with a subordinate was a problem because two other supervisors at MRS had dated employees whom they supervised.  The Manual also prohibited the use of plaintiff's business cell phone for personal purposes.  Phone records indicated that plaintiff frequently used his business

6

cell phone to speak with the MRS volunteer after work hours. Plaintiff testified, however, that no one ever complained to him about his cell phone use.

Plaintiff testified that other employees had divorced while working at MRS, but he did not know of any other employee who had been terminated because of a divorce. Furthermore, in January 2001, he learned that Mary had an affair with an MRS mechanic. Plaintiff considered the situation awkward but never confronted the mechanic, and Mary was not terminated or disciplined because of the affair.

Plaintiff also testified that, during the course of his employment, he was never subject to formal discipline. Plaintiff emphasized that he was promoted twice and received raises annually, even after Redden learned of the affair. The Manual called for regular performance evaluations, but plaintiff testified that he only received one informal performance evaluation, in October 2000, which was conducted by Redden and which plaintiff characterized as positive.

Plaintiff's friend and former colleague, Wally Maines, testified that he had worked with plaintiff at MRS and that he believed plaintiff was a good supervisor. Maines testified that plaintiff had encountered some issues with scheduling, and that Maines felt that he would have done a better job at scheduling than plaintiff. Maines explained that on several occasions, he

7

informed Redden of the scheduling issues and Maines' desire to do plaintiff's job. Redden, however, never implemented Maines' suggestions and did not offer Maines the job. Maines acknowledged that some of the scheduling issues could have been caused by uncontrollable factors unrelated to plaintiff's job performance, and that some problems were caused by staff cuts dictated by the Board and Redden. Maines also testified that, after plaintiff was terminated, he had a conversation with plaintiff in which plaintiff suggested he was fired because of the prospect of an "ugly divorce."

Following plaintiff's termination, his position was filled by two employees -- Mary and a male employee -- who served as Co-Directors of Operations. Additionally, MRS appointed a male employee to the newly created position of Chief Operating Officer to supervise the co-directors of operations.

In March 2006, plaintiff and Mary filed for divorce. Their divorce was finalized that September. Plaintiff testified that the divorce was "amicable," and not "messy," and that he continues to have a good relationship with Mary.

II.

On February 6, 2008, plaintiff filed a complaint against MRS, Redden, and unnamed "John Does" who were involved in plaintiff's termination. The complaint asserted two counts: wrongful discrimination on the basis of sex and marital status

8

in violation of the LAD, N.J.S.A. 10:5-1 to -42, and the State Constitution (count one); and common law wrongful discharge (count two). A trial commenced before a jury on the LAD claim.[1] At the conclusion of plaintiff's case, defendants filed a motion for judgment pursuant to Rule 4:40-1 and a motion for involuntary dismissal pursuant to Rule 4:37-2.

After hearing oral argument, the court issued a written decision granting the motion for involuntary dismissal, thereby dismissing plaintiff's gender and marital status LAD claims. In its decision, the court held that plaintiff was required to establish four elements to succeed on his LAD claim: 1) that plaintiff is a member of a protected class; 2) that he was performing his job at a level that met his employer's legitimate expectations prior to his termination; 3) that he was fired nevertheless; and 4) that he was replaced by someone not in the same protected class, that non-protected-class workers with comparable work records were retained, or that he was terminated under circumstances giving rise to an inference of discrimination.

The trial court found that plaintiff failed to satisfy factor two, because he did not demonstrate that he was

---

[1] The trial court dismissed plaintiff's constitutional claims and common law wrongful discharge claims prior to trial.

performing, or qualified to perform, the positions of Chief Operating Officer and Co-Director of Operations,[2] which were newly created when he was terminated.

The court also found a failure of proof regarding factor four. The court concluded that plaintiff had not shown that non-protected workers with comparable work records were retained or that he was replaced by someone not in the same protected class, because the new positions were filled by Mary and two men. The court also concluded that plaintiff had failed to show that he was terminated under circumstances giving rise to an inference of discrimination.

As to plaintiff's marital-status-discrimination claim, the court determined that plaintiff had failed to present any evidence "that he was terminated because he was either married or unmarried" or because he was having an affair, or "any evidence that employees were treated differently based on whether they were single, married, separated or divorced." Instead, the court found that plaintiff presented proof that he was terminated because management was concerned about the likelihood of an ugly or messy divorce, which the court held did not give rise to a marital-status-discrimination claim.

---

[2] The trial court refers to the Co-Director of Operations position as "Director of Field Operations."

Plaintiff appealed.  The Appellate Division affirmed the dismissal of plaintiff's gender-discrimination claim but reversed the dismissal of plaintiff's marital-status-discrimination claim.  In reversing the dismissal of plaintiff's marital-status-discrimination claim, the panel noted that plaintiff's appeal raised the issue of the scope of the marital-status protection under the LAD and interpreted "marital status" to include the states of being divorced, engaged to be married, separated, and involved in divorce proceedings.  The appellate panel found that Redden's comment that plaintiff was being terminated because he was going to go through an "ugly divorce" constituted direct evidence of discrimination and that there was evidence that plaintiff had been terminated because of negative stereotypes about divorcing employees.  Therefore, the panel determined that plaintiff had established a prima facie case of discrimination based on a change in the status of his relationship "from married to soon-to-be-divorcing[.]"

We granted defendants' petition for certification.  Smith v. Millville Rescue Squad, 220 N.J. 42 (2014).

### III.

#### A.

Defendants limit their argument before this Court to plaintiff's marital-status-discrimination claim pursuant to the LAD.  They contend that the Appellate Division erred in finding

11

that plaintiff had established a prima facie claim of marital-status discrimination. Defendants submit that plaintiff was terminated not because of his marital status, but rather because of the identity and situation of the person he was divorcing -- another MRS employee. They urge this Court to recognize an employer's right to exercise legitimate business judgment to manage risk and resolve potential or perceived conflicts in the workplace. In support of that argument, defendants compare the employment action in this case to anti-nepotism policies, which have been deemed lawful under the LAD. See Thomson v. Sanborn's Motor Express, Inc., 154 N.J. Super. 555, 560-61 (App. Div. 1977) (finding employer's anti-nepotism policy did not violate LAD's protection against marital-status discrimination).

Defendants further argue that the Appellate Division ignored the LAD's plain language and adopted a broad definition of "marital status" that expanded the scope of marital-status discrimination. Relying on Thomson, supra, 154 N.J. Super. at 560, defendants argue that "marital status" has always been defined to mean "either married or single."

B.

Plaintiff argues that the Appellate Division did not expand the definition of "marital status" in the LAD but simply defined "marital status" according to its common usage to include the categories of single, married, divorced, and separated.

12

Plaintiff maintains that there was no evidence that his divorce would have an impact on the workplace and that he was terminated based on stereotypes about divorcing persons in violation of the LAD. Plaintiff further contends that the Appellate Division's holding is not inconsistent with prior decisions upholding the legality of anti-nepotism policies.

Plaintiff argues that the Appellate Division properly found that he presented sufficient evidence at trial to defeat defendants' motion for involuntary dismissal. In particular, plaintiff contends that he established a prima facie case of marital-status discrimination through his testimony that Redden had told him that he was terminating plaintiff because he would be going through an "ugly divorce," and that if plaintiff had reconciled with his wife, Redden would not have terminated him. Plaintiff also emphasizes that he provided direct evidence of discrimination; therefore, the trial court employed an erroneous standard to evaluate his evidence, leading to an erroneous decision to dismiss his marital-status LAD claim.

C.

Amicus curiae the American Civil Liberties Union of New Jersey (ACLU-NJ) argues that the LAD reflects New Jersey's strong public policy against discrimination and must be construed "to prohibit discrimination against individuals based on invidious stereotypes." ACLU-NJ urges the Court to interpret

13

the LAD as including "protection against stereotypes related to an impending marriage or impending divorce."  In reaching this conclusion, ACLU-NJ submits that the Court need not make "a broad pronouncement" about whether the marital-status protection prohibits an employment action based on the identity of a complainant's spouse.  ACLU-NJ argues that the Court can find in plaintiff's favor without affecting the legality of anti-nepotism policies by holding that employers who permit the employment of spouses may not "thereafter discriminate against those who are in the process of changing their marital status in relation to another employee."

IV.

The threshold issue before the Court is whether the LAD's prohibition against discrimination based on marital status extends to a person who has separated from their spouse and is in the process of obtaining a divorce.  This is a question of law that requires de novo review.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The LAD identifies several actions taken by an employer against an employee or prospective employee as unlawful employment practices.  Those actions include the failure to employ, the discharge of an employee, or the forced retirement of an employee based on factors such as race, sex, marital

14

status, national origin, and age.  The employment discrimination provision of the LAD provides:

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a.  For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individuals[.]
>
> [N.J.S.A. 10:5-12(a) (emphasis added).]

Marital status is not a defined term.

When the LAD was initially enacted in 1945, it protected individuals from discrimination based on "race, creed, color, national origin or ancestry."  L. 1945, c. 169, § 11. Discrimination based on marital status first appeared in the LAD as a prohibited employment practice in 1970, as part of a comprehensive amendment to the LAD.  See L. 1970, c. 80, § 14. Marital status was not included in the bill when initially introduced, see Assembly Bill No. 403, 194th Leg. (N.J. 1970), but was added prior to the bill's adoption by the Senate, Senate

15

<u>Amendments to Assembly Bill No. 403</u>, 194th Leg. (April 27, 1970).  We have not identified any documents or statements specifically addressing the inclusion of this category in the 1970 amendment.  We note, however, that the inclusion of marital status in the LAD coincided with the attention that discrimination against women based on their marital status was receiving, including the commencement of legal proceedings in various courts challenging the employment practices of some companies that conditioned hiring and continued employment for women in certain positions on being single.  <u>See, e.g.</u>, <u>Sprogis v. United Air Lines, Inc.</u>, 444 <u>F.</u>2d 1194, 1196-97 (7th Cir.) (affirming trial court determination that employer committed unlawful employment practice when it discharged flight attendant because of her marriage), <u>cert. denied</u>, 404 <u>U.S.</u> 991, 92 <u>S. Ct.</u> 536, 30 <u>L. Ed.</u> 2d 543 (1971).

New Jersey does not stand alone in barring discrimination based on marital status.  At least twenty states offer some form of protection from discrimination based on marital status.  <u>See</u> Nicole Buonocore Porter, <u>Marital Status Discrimination:  A Proposal for Title VII Protection</u>, 46 <u>Wayne L. Rev.</u> 1, 15 (2000).  Many states have not defined the term.  <u>See, e.g.</u>, <u>Conn. Gen. Stat.</u> § 46a-60; <u>Del. Code Ann. Tit. 19</u>, §§ 710, 711.  Other states define "marital status" in their anti-discrimination statutes but are divided on the scope of the

16

marital-status protection. Compare, Haw. Rev. Stat. § 378-1 (defining marital status as "the state of being married or being single"); Neb. Rev. Stat. § 48-1102(12) (defining marital status as "the status of a person whether married or single") with, Colo. Rev. Stat. § 24-34-301(4.5) ("'Marital status' means a relationship or a spousal status of an individual, including but not limited to being single, cohabiting, engaged, widowed, married, in a civil union, or legally separated, or a relationship or a spousal status of an individual who has had or is in the process of having a marriage or civil union dissolved or declared invalid."); D.C. Code § 2-1401.02(17) ("'Marital status' means the state of being married, in a domestic partnership, single, divorced, separated, or widowed and the usual conditions associated therewith, including pregnancy or parenthood."); 775 Ill. Comp. Stat. 5/1-103(J) ("'Marital status' means the legal status of being married, single, separated, divorced or widowed."); Minn. Stat. § 363A.03(Subd. 24) ("'Marital status' means whether a person is single, married, remarried, divorced, separated, or a surviving spouse and, in employment cases, includes protection against discrimination on the basis of the identity, situation, actions, or beliefs of a spouse or former spouse."); Wash. Rev. Code § 49.60.040(17) ("'Marital status' means the legal status of being

17

married, single, separated, divorced, or widowed."); <u>Wis. Stat.</u> § 111.32(12) (same).

To determine the scope and limits of the protection afforded by the LAD to an employee's marital status, we must identify and implement the legislative intent. <u>State v. Smith</u>, 197 <u>N.J.</u> 325, 332 (2009). First, the Court must look to the plain language of the statute as "the best indicator of that intent[.]" <u>DiProspero v. Penn</u>, 183 <u>N.J.</u> 477, 492 (2005). "The language of the statute must be construed in accordance with its ordinary and common-sense meaning." <u>Saccone v. Bd. of Trs. of the Police & Firemen's Ret. Sys.</u>, 219 <u>N.J.</u> 369, 380 (2014) (citations omitted). If the plain language of the statute is clear and "susceptible to only one interpretation[,]" then the Court should apply that plain-language interpretation. <u>DiProspero</u>, <u>supra</u>, 183 <u>N.J</u> at 492 (citations omitted). If, however, "there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" <u>Id.</u> at 492-93 (quoting <u>Cherry Hill Manor Assocs. v. Faugno</u>, 182 <u>N.J.</u> 64, 75 (2004)).

"Because this case involves the LAD, special rules of interpretation also apply." <u>Nini v. Mercer Cty. Cmty. Coll.</u>, 202 <u>N.J.</u> 98, 108 (2010). When confronted with any interpretive

18

question, we must recognize that "the LAD is remedial legislation intended to 'eradicate the cancer of discrimination' in our society[,]" and should therefore be liberally construed "in order to advance its beneficial purposes." Id. at 115; see also Saccone, supra, 219 N.J. at 381 (noting that statutes which are "remedial in character" "should be liberally construed . . . in favor of the persons intended to be benefited thereby" (alteration in original) (quoting Geller v. Dep't of Treasury, 53 N.J. 591, 597-98 (1969))); Lehmann v. Toys 'R' Us, 132 N.J. 587, 612 (1993) ("We emphasize that the LAD is remedial legislation."). "[T]he more broadly [the LAD] is applied, the greater its antidiscriminatory impact." Nini, supra, 202 N.J. at 115 (second alteration in original) (quoting L.W. ex rel. L.G. v. Toms River Reg'l Schs. Bd. of Educ., 189 N.J. 381, 400 (2007)). Because discrimination is still a pervasive problem in the modern workplace, even "novel arguments" advanced by victims of workplace discrimination "require our utmost care and attention in order that we may be steadfast in our efforts to effectuate the Legislature's goal of workplace equality[.]" Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 260 (2010).

Despite the absence of a definition of "marital status" or legislative history demarcating the boundaries of this protection, the stated purpose and goals of the LAD strongly suggest that we should consider "marital status" as more than

19

the state of being single or married.  A broader interpretation is consistent with the remedial purpose of the statute, advances the goal of "eradication 'of the cancer of discrimination' in the workplace," Bergen Commercial Bank v. Sisler, 157 N.J. 188, 199 (1999) (quoting Fuchilla v. Layman, 109 N.J. 319, 334, cert. denied, 488 U.S. 826, 109 S. Ct. 75, 102 L. Ed. 2d 51 (1988)), and prevents employers from resorting to invidious stereotypes to justify termination of the employment of a never-married employee, an engaged employee, a separated employee, an employee involved in divorce litigation, or a recently widowed employee.

On the other hand, we need not disturb long-settled precedent that holds that anti-nepotism policies do not violate the LAD.  Indeed, the distinction between legitimate business decisions, such as anti-nepotism policies, and impermissible marital-status discrimination, is illustrated by the two opinions that have addressed the scope of the "marital status" protection:  Thomson, supra, 154 N.J. Super. 555, and Slohoda v. United Parcel Service, Inc., 193 N.J. Super. 586 (App. Div.), certif. denied, 97 N.J. 606 (1984).

In Thomson, supra, the defendant employer had a "policy prohibiting the contemporaneous full-time employment of relatives in the same department or terminal[.]"  154 N.J. Super. at 557.  The plaintiff was discharged pursuant to that policy because her husband worked in the same terminal.  Id. at

20

558. The plaintiff filed a complaint with the Division on Civil Rights alleging marital-status discrimination in violation of the LAD, and the Director found for the plaintiff. Id. at 559. The employer appealed, and the Appellate Division reversed, holding that an anti-nepotism policy does not violate the LAD because the LAD's "provisions were not designed to prohibit employment discrimination based upon specific family relationships[.]" Id. at 561. The appellate panel also held that the employer's failure to apply the policy consistently did not affect the determination of the case. Ibid. The panel noted, however, that a plaintiff may have a valid LAD claim if she can show that "the uneven enforcement of the policy was conspicuously marked by its consistent application solely for married relatives as distinguished from other types of relatives." Ibid.

In Slohoda, supra, the plaintiff employee claimed that "he was discharged because he was a married man who had a sexual liaison with a woman other than his wife." 193 N.J. Super. at 589. The plaintiff alleged that an unmarried employee would not have been terminated for similar conduct, suggesting that "the company policy was that any married management employee who engaged in sexual activity out of wedlock would be discharged, but that any unmarried management employee who engaged in sexual activity would not be discharged." Ibid. The Appellate

Division concluded that the plaintiff had a valid claim of impermissible marital-status discrimination under the LAD, because the plaintiff presented evidence that the "controlling factor" in the plaintiff's termination was his status as a married person.  Id. at 589-92.  The appellate panel held that, "if an employer's discharge policy is based in significant part on an employee's marital status, a discharge resulting from such policy violates [the LAD.]"  Id. at 590.

We therefore conclude that marital status should be interpreted to include those who are single or married and those who are in transition from one state to another.  This interpretation embraces basic decisions an employee makes during his or her lifetime.  A person considering marriage or divorce or confronting the death of a spouse should not fear that a marriage ceremony, a divorce decree, or a funeral would trigger a loss of employment or a promised promotion.

Moreover, the interpretation of marital status that we adopt today does not interfere with an employer's legitimate business judgment and policies regarding its workforce.  An employer is not prevented from disciplining or terminating an employee who is inattentive to his job responsibilities or whose actions disrupt the efficient performance of critical tasks.  Rather, our interpretation prevents an employer from resorting to stereotypes in its assessment of a potential employee or an

22

existing employee that bear no relation to the employee's actual performance in the workplace. Protecting those employees who are single, married, or transitioning between those marital states prevents an employer from engaging in commonplace stereotypes that a single employee is not committed to his career or that an engaged employee will be distracted by wedding preparations, or that a divorcing employee will be distracted from his job and even disruptive in the workplace, particularly if the estranged spouse or the spouse's friends and family are employed by the same employer.

The interpretation we adopt today also does not require us to disturb settled precedent harmonizing the LAD and anti-nepotism policies. Employers are free to adopt anti-nepotism policies, but they may not enforce them unevenly based on marital status or any other protected class. Likewise, if an employer chooses not to have an anti-nepotism policy, and instead freely employs coworkers who are married or related to one another, the employer may not thereafter discriminate against a particular employee whose marriage dissolves. Conflict may be inevitable among spouses and other family members, but employers may not base their employment decisions on stereotypes about how marital conflict will impact the workplace.

V.

23

A.

The next issue we must address is whether the trial court properly evaluated the proofs presented by plaintiff to support his marital-status-discrimination claim. An employee who commences an action seeking redress for an alleged violation of the LAD "may attempt to prove employment discrimination by either direct or circumstantial evidence."[3] Sisler, supra, 157 N.J. at 208 (citation omitted).

In order to establish a prima facie case of employment discrimination by direct evidence, the plaintiff must produce evidence "that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action[.]" A.D.P. v. ExxonMobil Research & Eng'g Co., 428 N.J. Super. 518, 533 (App. Div. 2012) (alteration in original) (quoting McDevitt v. Bill Good

---

[3] A case established through direct evidence is also referred to as either a "Price Waterhouse case" or a "mixed-motive case," and a case established through circumstantial evidence may be referred to as a "McDonnell Douglas case" or a "pretext case." See Price Waterhouse v. Hopkins, 490 U.S. 228, 277-78, 109 S. Ct. 1775, 1804-05, 104 L. Ed. 2d 268, 305 (1989) (O'Connor, J., concurring) (describing requirements for establishing prima facie case of discrimination by direct evidence); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668, 677 (1973) (describing requirements for establishing prima facie case of discrimination by circumstantial evidence); Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 100-01 (2000) (holding that type of evidence is determinative in whether case is "McDonnell Douglas or 'pretext' case" or "Price Waterhouse or 'mixed motive' case").

Builders, Inc., 175 N.J. 519, 527 (2003)). Direct evidence of discrimination may include evidence "of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 101 (2000) (citation omitted). Such evidence, "if true, [must] demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." Sisler, supra, 157 N.J. at 208. A plaintiff has presented direct evidence of discrimination if the court determines that "a statement made by a decisionmaker associated with the decisionmaking process actually bore on the employment decision at issue and communicated proscribed animus." McDevitt, supra, 175 N.J. at 528 (citing Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002)).

After the plaintiff sets forth "direct evidence of discriminatory animus, the employer must then produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision." Fleming, supra, 164 N.J. at 100 (quoting Jackson v. Ga.-Pac. Corp., 296 N.J. Super. 1, 18 (App. Div. 1996), certif. denied, 149 N.J. 141 (1997)). In other words, once a plaintiff shows that an employer had a discriminatory animus, the employer has

25

"only an affirmative defense on the question of 'but for' cause or cause in fact." Ibid. (quoting Jackson, supra, 296 N.J. Super. at 18).

In order to establish a prima facie case of discrimination through circumstantial evidence, the plaintiff must prove, by a preponderance of the evidence, the four elements of the McDonnell Douglas test. Sisler, supra, 157 N.J. at 209-10 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). A plaintiff alleging discriminatory discharge must show: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." Victor v. State, 203 N.J. 383, 409 (2010) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596-97 (1988)).

After the plaintiff has established a prima facie case of discrimination by circumstantial evidence, the employer is given the opportunity to rebut the presumption of discrimination "with admissible evidence of a legitimate, non-discriminatory reason for its rejection of the employee." Sisler, supra, 157 N.J. at 210. If the employer has succeeded in rebutting the presumption of discrimination, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's

26

proffered reason for the termination was in fact a pretext for discrimination.  Id. at 211.

The key difference between a direct-evidence case and a circumstantial-evidence case is "the kind of proof the employee produces on the issue of bias."  Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995).  Simply put, the employee must set forth "more direct evidence" in a direct-evidence case than in a McDonnell Douglas case involving circumstantial evidence.  Id. at 1096 n.4.  "[D]irect evidence of intentional discrimination is hard to come by[,]" so the McDonnell Douglas test was developed to permit employees to prove discrimination using circumstantial evidence.  Sisler, supra, 157 N.J. at 209-10 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 271, 109 S. Ct. 1775, 1802, 104 L. Ed. 2d 268, 301 (1989) (O'Connor, J., concurring)).

In the rare case in which there is direct evidence of discrimination, "the McDonnell Douglas analysis does not apply." A.D.P., supra, 428 N.J. Super. at 533 (citing Healey v. Southwood Psychiatric Hosp., 78 F.3d 128, 131 (3d Cir. 1996); Snyder v. Norfolk S. Ry. Corp., 463 F. Supp. 2d 528, 534 (E.D. Pa. 2006), aff'd, 271 Fed. Appx. 150 (3d Cir. 2008)); see also Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S. Ct. 613, 621-22, 83 L. Ed. 2d 523, 533 (1985) (stating, in connection with claim under Age Discrimination in Employment

27

Act, 29 U.S.C.A. §§ 621 to 634, that "the McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination"). "[T]he production of direct evidence of unlawful discrimination destroys 'the . . . presumption of good faith concerning . . . employment decisions which is accorded employers facing only circumstantial evidence of discrimination.'" Sisler, supra, 157 N.J. at 209 (quoting Price Waterhouse, supra, 490 U.S. at 265-66, 109 S. Ct. at 1799, 104 L. Ed. 2d at 297-98 (O'Connor, J., concurring)). Accordingly, "direct evidence of discriminatory animus leads not only to a ready logical inference of bias, but also to a rational presumption that the person expressing bias acted on it." Starceski, supra, 54 F.3d at 1097.

B.

In reviewing a motion for involuntary dismissal under Rule 4:37-2(b) or a motion for judgment under Rule 4:40-1, we apply the same standard that governs the trial courts. ADS Assocs. Grp. v. Oritani Sav. Bank, 219 N.J. 496, 511 (2014); Frugis v. Bracigliano, 177 N.J. 250, 269 (2003). Both motions are governed by "the same evidential standard: 'if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be

28

denied[.]'" Verdicchio, supra, 179 N.J. at 30 (quoting Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000)). The motion should only "be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008).

VI.

Applying the above-stated principles to the instant case, we affirm the appellate panel's decision that the trial court erred in granting defendants' motion for involuntary dismissal.

Here, the facts asserted by plaintiff, if assumed to be true, demonstrate that plaintiff was discharged "in significant part" based on his marital status. Slohoda, supra, 193 N.J. Super. at 590. Plaintiff was not merely terminated because of the identity of his spouse, an MRS employee. Plaintiff was terminated based on his employer's stereotypes about the impact his divorce might have on the work performance of him and others. Plaintiff testified that Redden's statements revealed his concern that the Smith divorce would be an "ugly divorce," even though there was apparently no evidence supporting Redden's concern. In fact, plaintiff testified that his divorce was amicable and not at all "ugly." Plaintiff also stated that Redden told him that if he and his wife had been able to reconcile, plaintiff would not have been terminated. Defendants

29

were not enforcing an anti-nepotism policy -- in fact, defendants openly permitted plaintiff and his wife to work together -- but instead terminated plaintiff because of invidious stereotypes about divorcing persons.  Such discrimination is unlawful under the LAD.

The trial court went awry when it evaluated plaintiff's marital-status-discrimination claim through the prism of the McDonnell Douglas circumstantial-evidence analysis rather than the direct-evidence analysis.  To be sure, some of the evidence presented by plaintiff does tend to establish unlawful discrimination by circumstantial evidence.  Plaintiff testified at length about his employment history, including promotions, regular pay increases, and the lack of any criticism or poor performance evaluations.  Plaintiff also highlighted his ability to control costs while maintaining the quality of the services provided by MRS.  Moreover, there was not a shred of evidence that plaintiff's separation from his co-employee wife caused any disruption in the workplace.  In fact, the evidence presented by plaintiff, which the trial court was obliged to accept as true, revealed that the divorce was prosecuted amicably and swiftly.[4]

---

[4]  Indeed, although the trial court erred in failing to evaluate plaintiff's case under the direct-evidence framework, our review of the trial record indicates that there was sufficient evidence for plaintiff to survive a motion for judgment under the circumstantial-evidence analytical framework.

30

Plaintiff, however, also presented direct evidence of discrimination, but the trial judge failed to evaluate the sufficiency of that evidence to avoid an involuntary dismissal. Plaintiff's case included Redden's facially discriminatory statements about divorcing persons, which clearly signaled that plaintiff was fired because of the demise of his marriage. Redden's statements in June 2005 and February 2006 reveal not only his displeasure about plaintiff's fractured marriage but also his reliance on stereotypes about the manner in which divorcing employees conduct themselves in the workplace. Redden told plaintiff that he believed plaintiff and Mary would be undergoing an "ugly divorce" and that, had plaintiff been able to reconcile with his wife, he would not have been terminated.

Having submitted direct evidence of discrimination, plaintiff was not required to satisfy the four McDonnell Douglas factors for establishing a prima facie case of discrimination based on circumstantial evidence. A.D.P., supra, 428 N.J. Super. at 533 (citations omitted). Viewing that direct evidence in the light most favorable to plaintiff, the trial court should have denied defendants' motion and permitted the jury to render a verdict on plaintiff's marital-status-discrimination claim.

## VII.

In summary, we conclude that the LAD prohibits an employer from discriminating against a prospective employee or a current

employee because they are single, married, or transitioning from one state to another.  The LAD aims to "discourage the use of categories in employment decisions which ignore the individual characteristics of particular applicants."  Sisler, supra, 157 N.J. at 204 (quoting Ogden v. Bureau of Labor, 682 P.2d 802, 810 (Or. Ct. App. 1984), aff'd in part and rev'd in part, 699 P.2d 189 (Or. 1985)).  It does not, however, prohibit employers from considering factors that "relate to the demonstrated needs of the employer and the actual capabilities of an individual to perform the job."  Ibid. (quoting Ogden, supra, 682 P.2d at 810).  Therefore, the LAD does not prohibit an employer from firing an employee who is engaged in a dispute -- marital or otherwise -- that has become so contentious that it interferes with his or other employees' ability to carry out their work.

Here, Redden's statements clearly give rise to an inference of discrimination.  Furthermore, accepting plaintiff's evidence as true, Redden's remarks demonstrate not only that Redden was biased against divorcing persons, but also that Redden's animus towards divorcing persons "actually bore on the employment decision at issue[.]"  McDevitt, supra, 175 N.J. at 528 (citation omitted).  Therefore, the trial court erred in finding that plaintiff failed to establish that he was terminated under circumstances that give rise to an inference of discrimination.

## VIII.

The judgment of the Appellate Division is affirmed.


CHIEF JUSTICE RABNER, and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and SOLOMON, join in JUDGE CUFF's opinion. JUSTICE FERNANDEZ-VINA did not participate.