# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0099-22

C.A.L.,

     Plaintiff-Respondent,

v.

A.C.,[1]

     Defendant-Appellant.

_____

Submitted October 17, 2023 – Decided November 14, 2023

Before Judges Whipple, Enright and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-1696-22.

Triarsi Betancourt Wukovits & Dugan, LLC, attorneys for appellant (Marc A. Sposato, of counsel and on the briefs).

Lowenstein Sandler LLP, attorneys for respondent (Michael A. Kaplan, Amanda Kate Cirpriano, Claire B. Dronzek and Emily B. Sklar, of counsel and on the brief).

---

[1] We use initials to protect the confidentiality of the parties. R. 1:38-3(d)(10).

PER CURIAM

Defendant A.C. appeals from an August 23, 2022 final restraining order (FRO) entered against him and in favor of plaintiff C.A.L., pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.

Plaintiff obtained a temporary restraining order (TRO) against defendant following an incident that occurred between them on January 30, 2022. Plaintiff alleged the predicate act of assault under N.J.S.A. 2C:12-1. On May 18, 2022, plaintiff amended her TRO complaint (ATRO), adding additional facts to include the predicate act of sexual assault, N.J.S.A. 2C:14-2,[2] and providing a prior history of domestic violence.

Following trial, the judge awarded plaintiff an FRO. The trial judge determined that: (1) plaintiff was a credible witness and defendant was not; (2) plaintiff had proved that defendant committed the predicate act of assault; (3) the January 30, 2022 assault was "very serious and egregious"; and (4) an FRO was necessary to prevent further abuse.

Defendant appeals, arguing that the trial judge erred by: (1) determining that he committed the predicate act of assault and (2) failing to conduct the

---

[2] The trial judge determined that plaintiff did not establish, by the preponderance of the evidence, that defendant committed sexual assault. That determination was not appealed, and, therefore, we do not address it.

A-0099-22

required legal analysis to enter an FRO under N.J.S.A. 2C:25-19, Silver v. Silver[3] and its progeny because: (a) he did not pose an immediate danger to plaintiff; (b) he and plaintiff did not have a history of domestic violence; and (c) N.J.S.A. 2C:25-29 factors (a)(3) – (a)(5) were nonexistent and not properly considered by the court.

Because the trial judge made appropriate credibility determinations, his factual findings are supported by substantial credible evidence, and those facts were correctly applied to the law, we affirm.

## I.

Our review of a trial judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court fact[-]finding." Id. at 413. Such deference is particularly proper "when the evidence is largely testimonial and involves questions of credibility." Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117

---

[3] 387 N.J. Super. 112 (App. Div. 2006).

A-0099-22

(1997)).  On the other hand, we will review questions of law determined by the trial court de novo.  Smith v. Millville Rescue Squad, 225 N.J. 373, 387 (2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## II.

The one-day trial was conducted with plaintiff and defendant; both parties were represented by counsel and provided testimony.  The trial judge admitted photographs into evidence including:  a picture of plaintiff's facial injuries, following the January 30, 2022 incident; plaintiff's text message to her older brother on the day of the incident; and an anonymous Instagram message admittedly sent by defendant to plaintiff a few days after the incident.

The parties had a dating relationship between the summer of 2021 and January 30, 2022, the date of the incident that gave rise to plaintiff's filing for the TRO.  Plaintiff explained that on the morning of January 30, 2022, she and defendant were in a hotel room.  Defendant was on top of her as she laid face down on the bed.  When defendant got off of her, she wanted to go to the bathroom and started to put her clothes back on.  Defendant asked her why she was putting her clothes on and, after she ignored him, he "pinned [her] down to the bed with [her] two arms above [her]."  Plaintiff told him to let go, but "then

4

he covered [her] mouth with his hand." Plaintiff told him she could not breathe and he then "pinched [her] nose with his other hand," "covering [her] mouth and . . . nose at the same time." Defendant did this about three to four times. Plaintiff was "unable to breathe" and "felt really scared and confused."

After defendant got off of plaintiff, he demanded to see her phone. Initially, he "looked through her social media and then he . . . looked through [her] personal notes." Plaintiff became "uncomfortable" and took her phone back. Defendant persisted in trying to see the phone. Plaintiff refused and placed the phone on the table. Again, defendant pinned plaintiff down on the bed with her arms above her and demanded to see the phone. When plaintiff told him no, he slapped her across the face, on the cheek. She testified the slap "stung and hurt a lot."

Plaintiff texted her older brother for help. But then, fearing defendant would "become even angrier . . . and . . . do something even worse," she texted her older brother and told him "never mind" and deleted the text. Defendant saw plaintiff on her phone and "demanded to see [her] phone" again. Plaintiff refused and defendant put her in a "chokehold." Plaintiff described the chokehold as defendant "standing behind [her] and then put[ting] one arm around [her] neck and squeez[ing] her neck." Plaintiff "could [not] breathe and

5

. . . could barely move."  Plaintiff stated defendant would choke her "for a few seconds and then he would let go and . . . ask again or demand again to see [her] phone and [she] would say no."  Defendant did this "three or four times," and plaintiff testified she could not breathe or do anything.

The last time defendant choked her, plaintiff passed out.  She remembered "everything going black for a few seconds."  She recalled "seeing the hotel room in front of [her] but not realizing where [she] was and what was happening . . . [and] then realiz[ing] . . . [defendant] was still choking" her.  Eventually, defendant let go of her and she "start[ed] to walk toward the hotel room door."  Defendant told her to wait for him, but she ignored him and "kept walking . . . out the door into the hallway."  "Then [defendant] pulled [her] arm back really hard and it [caused] the hotel room door to hit [her] in the face while he was pulling [her] back."  Plaintiff's nose "hurt a lot" and she "had a bruise and cuts on her nose after."

Defendant denied that he ever "attempt[ed] to choke, hit, or suffocate" plaintiff.  He admitted that they had a verbal altercation about the phone and their relationship and he "kind of snapped" and "called [plaintiff] a fucking bitch." Further, he denied pulling plaintiff's arm resulting in her hitting the door.  Instead, he explained that he tried to hug her, and when she pushed away, she

6

A-0099-22

struck the door. He testified that plaintiff made these false allegations against him because she wanted to "cover-up" or "hide their relationship from her family." However, he admitted that a few days after the incident, he "messaged [plaintiff], on Instagram, from a fake account." The message stated:

> hey-
>
> . . . .
>
> please don't tell on me..that will ruin my life…[your brother] told me he'd contact the police…I understand…can we at the very least talk soon…I will listen..I will not argue…You will have my full attention without interruption…I will shut up…Your feelings are more important than my own.. What you say means the world… You deserve the best……I don't want to ruin my life, but without you my life is devastated. Without you I am empty. Without you I lose purpose…not a moment passes by that I don't think of you…every waking moment is filled with thoughts of you…the truth is I am empty without you…I would do anything for us to be on good terms..therapy? alright…space? alright…leave the military? alright…Be sweeter? alright…I will.

Defendant testified that he sent the message because he was concerned about getting "kicked out of the military" and his "life being ruined." Plaintiff testified that this anonymous message "scared" her because defendant "was trying to still contact" her and he "was not going to stop even if [she] tried to stop him."

7

A-0099-22

In describing their history of domestic violence, plaintiff testified that in December 2021, she and defendant were in his car. They were in an argument and plaintiff was giving him the "silent treatment." Defendant was "really upset . . . that [she] wasn't talking to him and he . . . threatened to throw [her] phone out the window if [she] didn't talk to him. . . . And then [defendant] while he was screaming, telling [her] to talk to him, . . . slapped [her] leg." The slap was "hard because it hurt and it stung." Plaintiff told defendant that it hurt and he slapped her leg again. The second slap "was hard and it hurt again." Plaintiff was "scared."

Further, plaintiff explained that in the past, defendant "verbally abused [her] by calling [her] 'retarded,' a 'bitch,' 'stupid bitch,' whenever he [was] upset with [her] during [their] arguments throughout their relationship."

Ultimately, plaintiff sought protection so she did not have to "worry about her safety and well[-]being" and because defendant could "still contact [her] through social media and through [her] number and he could come back to visit New Jersey and [she] would [not] know when."

### III.

The trial judge determined that plaintiff was the more credible witness, stating he "believe[d] . . . [plaintiff's] version of the events more than . . .

A-0099-22

[defendant]'s version of the events."  The trial judge made additional detailed credibility determinations based on his observations of the parties during their testimony.  He stated that he did not believe defendant's theory that plaintiff was "making this up for some payback to be vindictive" because the theory lacked "context [or] support."  The judge also rejected defendant's explanation for sending the anonymous message to plaintiff and instead found that defendant "knew that he made a horrible, horrible mistake."  Moreover, the judge concluded defendant was not credible when he testified that the parties' relationship went from "great" and "lovey dovey" to "toxic . . . in the span of five minutes."

Defendant contends that the trial judge erred in assessing the parties' credibility.  We disagree.

> [F]ew people are able, with any degree of accuracy, to judge on a subjective basis alone, the credibility of a witness.  As a result, critical analysis of the witness' interests, motive, and demeanor is important and examination of the objective reasonableness of the testimony is also highly probative.  Moreover, the factfinder must not only make the necessary observations of all the elements required for an assessment of credibility but also must articulate those findings in detail for the record.
>
> [State v. Locurto, 304 N.J. Super. 514, 519 (App. Div. 1997) rev'd on other grounds, 157 N.J. 463 (1999).]

A-0099-22

"When the credibility of witnesses is an important factor, the trial court's conclusions must be given great weight and must be accepted by the appellate court unless clearly lacking in reasonable support." N.J. Div. of Youth and Family Srvcs. v. F.M., 375 N.J. Super. 235, 259 (App. Div. 2005) (citing In re Guardianship of DMH, 161 N.J. 365, 382 (1999)). "[T]he trial court . . . has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel for the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Srvcs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Srvcs. v. M.M., 189 N.J. 261, 293 (2007)).

"We view the task of a judge considering a domestic violence complaint, where the jurisdictional requirements have otherwise been met,[4] to be two-fold." Silver, 387 N.J. Super. at 125.

"First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125.

---

[4] The parties both testified to having a "dating relationship" providing the trial court with jurisdiction under N.J.S.A. 2C:25-19(d).

A-0099-22

Here, the trial judge credited plaintiff's testimony and found that that defendant committed simple assault. Simple assault occurs when a person: "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another." N.J.S.A. 2C:12-1.

In reaching his conclusion the trial judge found that defendant:

> Grabbed her . . . he choked her . . . he slapped her and caused injury to her. And but for him not pulling on her arm to restrain her from leaving the room her face never would have smacked that door. His actions were reckless and [they] caused injury. And she suffered injury as outlined in [the photograph of plaintiff's nose].

We accept the trial judge's credibility determinations and are satisfied that his finding of simple assault is "supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12. Accordingly, we are convinced that he properly found that plaintiff satisfied the first prong of Silver.

Regarding the second Silver prong, we recognize "[t]he second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126; see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011) (explaining that a[n] FRO should not be issued without a finding that relief is "necessary to prevent further abuse" (quoting N.J.S.A.

2C:25-29(b))). "[T]he Legislature did not intend that the commission of one of the enumerated predicate acts of domestic violence automatically mandates the entry of a domestic violence restraining order." Id. at 126-27.

"[T]he guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) – 29(a)(6)." Id. at 127. But because some factors may be irrelevant to a given circumstance, "N.J.S.A. 2C:25-29(a) does not mandate that a trial court incorporate all of those factors into its findings when determining whether or not an act of domestic violence has been committed." Cesare, 154 N.J. at 401-02.

Here, the judge's analysis included a review of the appropriate statutory factors.[5] The trial judge found that there was a "previous history of domestic violence" perpetrated by defendant against plaintiff, pursuant to N.J.S.A. 2C:25-29(a)(1), concluding:

> in December [2021] . . . he slapped her [in] the car just like he slapped her in the room that day. I find that and I believe that at different times during the relationship he would call her "retarded," he would call her a "bitch," "a stupid bitch," just like he called her a fucking bitch that day.

---

[5] Defendant contends the judge erred by failing to specifically cite N.J.S.A. 2C:25-29(a)(4) or (a)(5). The lack of an explicit reference to these factors is of no moment because the judge addressed these factors in the body of his oral opinion as we note herein.

Further, the trial judge found that an FRO was in plaintiff's "best interest." N.J.S.A. 2C:25-29(a)(4). The trial judge detailed that plaintiff needs an FRO to "protect her health, safety and well-being" and "[s]he can now move on with her life without interference, controlling or abusive behavior."

Moreover, the trial judge found the "existence of immediate danger" to plaintiff. N.J.S.A. 2C:25-29(a)(5). The trial judge determined defendant's "conduct is escalating . . . [i]t goes from a couple of words to a couple slaps to choking, more slaps, to a chokehold, to recklessly grabbing her arms where her head smacks a door."

Importantly, the judge also implicitly recognized that "one sufficiently egregious action [may] constitute domestic violence . . . , even with no history of abuse between the parties . . . ." Id. at 402 (see A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016)) ("[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'"). In fact, the judge determined that defendant's actions on January 30, 2022, were "very serious and egregious" when defendant "grabbed," "choked," and "slapped" plaintiff, and "restrain[ed] her from leaving the [hotel] room."

Accordingly, we are persuaded the trial judge's determinations on the second Silver prong are amply supported on the record and that he correctly found plaintiff established the need for an FRO to "prevent further abuse," because "this is the type of case for which the issuance of final restraints [is] axiomatic or . . . 'perfunctory and self-evident.'" A.M.C., 447 N.J. Super. at 418 (quoting Silver, 387 N.J. Super. at 127).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0099-22