SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**<u>Victoria Crisitello v. St. Theresa School</u> (A-63-20) (085213)**

**Argued April 24, 2023 -- Decided August 14, 2023 -- Revised August 14, 2023**

**SOLOMON, J., writing for the Court.**

The Court considers whether defendant, the Church of St. Theresa (St. Theresa's), was entitled to summary judgment in a suit brought by Victoria Crisitello alleging employment discrimination contrary to the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, when she was fired from her position as an art teacher and toddler room caregiver because she became pregnant while unmarried in violation of the terms of her employment agreement, which required employees to abide by the teachings of the Catholic Church.

The St. Theresa School is a Roman Catholic elementary school that uses the official "Archdiocese of Newark Policies on Professional and Ministerial Conduct," the first section of which contains its Code of Ethics. In part, the Code of Ethics requires employees to "conduct themselves in a manner that is consistent with the discipline, norms[,] and teachings of the Catholic Church." In 2011, St. Theresa's hired Crisitello, a former student, who signed an acknowledgment of her receipt and understanding of employment documents including the Code of Ethics. In 2014, Sister Lee, the school principal, approached Crisitello about the possibility of teaching art full time. During their meeting, Crisitello stated that she was pregnant. A few weeks later, Sister Lee told Crisitello that she had violated the Code of Ethics by engaging in premarital sex and thus could not remain on St. Theresa's staff.

Crisitello filed a complaint alleging discrimination based on pregnancy and marital status. The trial court granted summary judgment in favor of St. Theresa's, finding that "the LAD clearly protects a religious institution . . . in requiring that an employee . . . abide by the principles of the Catholic faith," and no suggestion that Crisitello was terminated "for her pregnancy or marital status, per se." It held Crisitello was instead terminated for "violating the tenets of the Catholic Church, thereby violating the Code of Ethics." It also found the First Amendment barred her claims. The Appellate Division reversed, holding that the First Amendment barred neither Crisitello's claims nor "carefully measured discovery"; that the LAD did not bar consideration of the matter under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); and that Crisitello had made a prima facie case.

1

On remand, the trial court compelled discovery consistent with the Appellate Division's decision, and it again granted summary judgment in favor of St. Theresa's. The court explained that "the record is bare of any evidence that even remotely suggests that [Crisitello's pregnancy out of wedlock] is not the real reason for her termination." The trial court also found significant evidence in the record that St. Theresa's supports its married teachers who become pregnant and that another Catholic school, also within the Archdiocese of Newark, fired an unmarried male teacher after he revealed that his girlfriend was pregnant with their child.

The Appellate Division reversed, holding that "knowledge or mere observation of an employee's pregnancy alone is not a permissible basis to detect violations of the school's policy and terminate an employee." 465 N.J. Super. 223, 227, 238, 242 (App. Div. 2020). The court distinguished this case from Our Lady of Guadalupe School v. Morrissey-Berru, 140 S. Ct. 2049 (2020), on the basis that Crisitello did not perform "vital religious duties." Id. at 235-36. The appellate court ruled that despite Crisitello's concession -- that she knew premarital sex violated the tenets of the Catholic Church -- neither the Code of Ethics nor the employee handbook expressly mentioned premarital sex or that it would result in termination. Id. at 242.

St. Theresa's filed a notice of appeal as of right under Rule 2:2-1(a)(1) as well as a petition for certification, which the Court granted. 246 N.J. 315 (2021).

**HELD:** The "religious tenets" exception of N.J.S.A. 10:5-12(a) -- "it shall not be an unlawful employment practice" for a religious entity to follow the tenets of its faith "in establishing and utilizing criteria for employment" -- is an affirmative defense available to a religious entity when confronted with a claim of employment discrimination. Here, it is uncontroverted that St. Theresa's followed the religious tenets of the Catholic Church in terminating Crisitello. St. Theresa's was therefore entitled to summary judgment and the dismissal of the complaint with prejudice.

1. The LAD provides in part that it is unlawful for an employer "to discharge" an employee "because of . . . marital status . . . [or] pregnancy." N.J.S.A. 10:5-12(a). Although the LAD encompasses a wide variety of employment actions, it intentionally, and explicitly, declines to create a cause of action for others. For example, "it shall not be an unlawful employment practice . . . for a religious association or organization" to follow "the tenets of its religion in establishing and utilizing criteria for employment of an employee." Ibid. Because the Legislature thus expressly prescribed an exception to liability under the LAD based on a religious institution's reliance on the tenets of its faith in setting employment criteria, the religious tenets exception is an affirmative defense which must be pled and proven. If it is pled and proven, the employer need not contest the plaintiff's allegations. In LAD cases where a religious employer invokes the religious tenets exception, the employer must demonstrate that the challenged employment decision

2

relied solely on employment criteria adopted pursuant to the tenets of its religion. If the plaintiff employee fails to raise a genuine dispute of material fact as to whether the challenged decision relied solely on the religious tenets of the employer, then the affirmative defense stands as an absolute bar to liability. Determining whether a religious employer's employment action was based exclusively on the tenets of its religion requires application of only neutral principles of law and does not impermissibly entangle the courts in ecclesiastical matters. (pp. 20-26)

2. Based on the facts of this case, St. Theresa's has validly asserted the religious tenets exception as an affirmative defense. The undisputed evidence of record shows that Crisitello confirmed receipt and understanding of documents including the Code of Ethics. The religious tenets exception allowed St. Theresa's to require its employees, as a condition of employment, to abide by Catholic law, including that they abstain from premarital sex. Crisitello, a practicing Catholic and graduate of the St. Theresa School, acknowledged that St. Theresa's required her to abide by the tenets of the Catholic faith, including that she abstain from premarital sex, as a condition of her employment. The record evidence demonstrates that St. Theresa's consistently maintained its position that Crisitello was terminated for violating Catholic law by engaging in premarital sex. And Crisitello has presented no evidence to counter St. Theresa's asserted position. The Court rejects the Appellate Division's novel suggestion that Crisitello's firing was evidence of pretext simply because St. Theresa's did not "survey" its employees to discover other transgressions of the faith. Neither the LAD nor case law requires such an investigation, and the Court declines to impose this burden. Here, because Crisitello offers no evidence that the reason given for her termination was false, there exists no dispute of material fact and St. Theresa's is entitled to judgment as a matter of law. The religious tenets exception of the LAD precludes recovery here. The Court does not reach the constitutional questions presented. (pp. 27-32)

**REVERSED.**

**JUSTICE PIERRE-LOUIS, concurring,** agrees that Crisitello's LAD action fails but departs from the majority's analysis of the religious tenets exception as an affirmative defense such that the McDonnell Douglas framework does not apply. In Justice Pierre-Louis's view, plaintiff's claim fails because she has failed to meet her evidentiary burden at step three of the McDonnell Douglas framework.

**CHIEF JUSTICE RABNER, JUSTICE PATTERSON, and JUDGE HAAS (temporarily assigned) join in JUSTICE SOLOMON's opinion. JUSTICE PIERRE-LOUIS filed a concurrence. JUSTICES WAINER APTER and FASCIALE and JUDGE SABATINO (temporarily assigned) did not participate.**

3

SUPREME COURT OF NEW JERSEY

A-63 September Term 2020

085213

Victoria Crisitello,

Plaintiff-Respondent,

v.

St. Theresa School,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
465 N.J. Super. 223 (App. Div. 2020).

| Argued | Decided | Revised |
|--------|---------|---------|
| April 24, 2023 | August 14, 2023 | August 14, 2023 |

Peter G. Verniero argued the cause for appellant (Sills
Cummis & Gross, and Carella, Byrne, Cecchi, Olstein,
Brody & Agnello, attorneys; Peter G. Verniero, Michael
S. Carucci, and Christopher H. Westrick, of counsel and
on the briefs).

Thomas A. McKinney argued the cause for respondent
(Castronovo & McKinney, attorneys; Thomas A.
McKinney and Edward W. Schroll, of counsel and on the
brief).

Mark E. Chopko of the District of Columbia and
Pennsylvania bars, admitted pro hac vice, argued the
cause for amicus curiae New Jersey Catholic Conference
(Stradley Ronon Stevens & Young, and McKernan,
McKernan & Godino, attorneys; Mark E. Chopko,

Marissa Parker, Robert J. Norcia, Martin McKernan, and James J. Godino, Jr., of counsel and on the brief).

Eric C. Rassbach (The Becket Fund for Religious Liberty) of the California, Texas, and District of Columbia bars, admitted pro hac vice, argued the cause for amicus curiae Agudath Israel of America (Roselli Griegel Lozier & Lazzaro, attorneys; Eric C. Rassbach, Mark M. Roselli, and Daniel D. Benson (The Becket Fund for Religious Liberty) of the Utah and District of Columbia bars, admitted pro hac vice, of counsel and on the brief).

Jeremy Feigenbaum, Solicitor General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy Feigenbaum and Alec Schierenbeck, Deputy Solicitor General, of counsel, and Eve Weissman and Nadya Comas, Deputy Attorneys General, on the brief).

Ronald K. Chen argued the cause for amici curiae American Civil Liberties Union of New Jersey and American Civil Liberties Union (Rutgers Constitutional Rights Clinic Center for Law & Justice, attorney; Lindsey Kaley (American Civil Liberties Foundation) of the New York bar, admitted pro hac vice, of counsel and on the brief, and Ronald K. Chen, Jeanne LoCicero (American Civil Liberties Union of New Jersey Foundation), Alexander Shalom (American Civil Liberties Union of New Jersey Foundation), and Daniel Mach (American Civil Liberties Union Foundation) of the New York and District of Columbia bars, admitted pro hac vice, on the brief).

Natalie J. Kraner argued the cause for amici curiae National Women's Law Center, Americans United for Separation of Church and State, The Anti-Defamation League, California Women's Lawyers, The Clearinghouse on Women's Issues, The Feminist Majority Foundation, Gender Justice, GLBTQ Legal

2

Advocates & Defenders, The Kentucky Association of Sexual Assault Programs, KWH Law Center for Social Justice and Change, Interfaith Alliance Foundation, Legal Voice, The National Asian Pacific American Women's Forum, The National Association of Social Workers, The National Association of Women Lawyers, The National Coalition Against Domestic Violence, The National Council of Jewish Women, National Crittenton, The Reproductive Health Access Project, The Sikh Coalition, The Women's Law Center of Maryland, Inc., Transgender Law Center, Ujima, Inc: The National Center on Violence Against Women in the Black Community, Women Employed, Women With A Vision, Inc., The Women's Bar Association of the District of Columbia, The Women's Bar Association of the State of New York, and Women's Law Project (Lowenstein Sandler, attorneys; Natalie J. Kraner, Matthew J. Platkin, Stephanie Ashley, Markiana Julceus, Sunu P. Chandy and Laura Narefsky (National Women's Law Center) of the New York bar, admitted pro hac vice, Bradley Girard (Americans United for Separation of Church and State) of the New York and District of Columbia bars, admitted pro hac vice, and Richard B. Katskee (Americans United for Separation of Church and State) of the District of Columbia and Maryland bars, on the brief).

James E. Burden submitted a brief on behalf of amicus curiae New Jersey Association for Justice (Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, attorneys; James E. Burden, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

The Church of St. Theresa (St. Theresa's) owns and operates the St. Theresa School.  St. Theresa's terminated art teacher and toddler room caregiver Victoria Crisitello for violating the terms of her employment

agreement. That agreement required employees to abide by the teachings of the Catholic Church and forbade employees from engaging in premarital sex; Crisitello, who was unmarried, had become pregnant. In response to her firing, Crisitello filed a complaint against St. Theresa's alleging employment discrimination in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, based on pregnancy and marital status. St. Theresa's countered that its decision to terminate Crisitello was protected by both the First Amendment and the LAD.

In this appeal, we examine whether the Appellate Division properly reversed the trial court's grant of summary judgment and dismissal of the complaint with prejudice in favor of St. Theresa's. In doing so, we must consider the LAD, its "religious tenets" exception, and the McDonnell Douglas[1] burden-shifting framework. Because we decide this case on narrow, statutory grounds, we decline to rule on the parties' constitutional arguments concerning the First Amendment.

We first hold that the "religious tenets" exception of N.J.S.A. 10:5-12(a) -- "it shall not be an unlawful employment practice" for a religious entity to follow the tenets of its faith "in establishing and utilizing criteria for employment" -- is an affirmative defense available to a religious entity when

---

[1] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

4

confronted with a claim of employment discrimination. Second, the uncontroverted fact is that St. Theresa's followed the religious tenets of the Catholic Church in terminating Crisitello. We thus conclude that St. Theresa's was entitled to summary judgment and that the trial court correctly dismissed the complaint with prejudice.

I.

A.

The St. Theresa School is a Roman Catholic elementary school operating within the Archdiocese of Newark. The school uses the official "Archdiocese of Newark Policies on Professional and Ministerial Conduct" (Ministerial Policies), the first section of which contains its Code of Ethics. In part, the Code of Ethics requires employees to "conduct themselves in a manner that is consistent with the discipline, norms[,] and teachings of the Catholic Church." St. Theresa's also has a faculty handbook that explains the importance of teachers "express[ing] a value-centered approach to living" and serving "as positive role models for their students."

In 2011, St. Theresa's hired Crisitello, a former student, to work as a caregiver in the toddler room. When she was hired, Crisitello signed an acknowledgment form which explained: "My signature below indicates that I have received a copy of the Policies on Professional and Ministerial Conduct

5

adopted by the Archdiocese of Newark; and that I have read and understand those Policies, including the Archdiocesan Code of Ethics, and agree to abide by all of the Policies and the Code of Ethics."  About a year later, Crisitello was asked to teach art to elementary school students in addition to working in the toddler room.  In that role, she taught two days a week and worked one day in the toddler room.  In 2014, Sister Lee, the school principal, approached Crisitello about the possibility of her teaching art full time.  Crisitello, who was unmarried at the time, told Sister Lee that she wanted a raise if she accepted the new role, explaining that she was pregnant and that it would thus be more taxing to work additional hours.

A few weeks later, Sister Lee met with Crisitello to explain that she had violated the Code of Ethics by engaging in premarital sex and thus could not remain on St. Theresa's staff.  Sister Lee offered Crisitello the option of resigning or being terminated.  Ultimately, Crisitello was terminated and replaced by a married woman with children.

B.

1.

In April 2014, Crisitello filed a charge against St. Theresa's with the Equal Employment Opportunity Commission (EEOC or Commission), alleging violations of Title VII of the Civil Rights Act.  The EEOC directed St.

6

Theresa's to provide its position on the issues charged with supporting documentation. St. Theresa's provided supporting documents and responded that "Crisitello was not terminated because of her pregnancy. She was terminated for violation of the Code of Professional and Ministerial Conduct . . . and not following the tenets of the Roman Catholic faith by engaging in sex outside of marriage."

Ultimately, the EEOC was unable to "conclude that the information obtained establishes a violation" of the Civil Rights Act. The Commission noted that its conclusion was not tantamount to a finding of compliance with Title VII and that Crisitello could still file an action in federal district court.

2.

Later that same year, Crisitello filed a complaint against St. Theresa's in New Jersey Superior Court alleging that St. Theresa's violated the LAD by discriminating against her on the basis of pregnancy (count one) and marital status (count two). According to Crisitello's complaint, the school's explanation for her termination -- her violation of the tenets of the Catholic faith -- was "mere pretext."

In early 2015, St. Theresa's moved for summary judgment and dismissal of the complaint, arguing that it lawfully terminated Crisitello's employment. The trial court denied the motion, citing the need for discovery. The parties

disputed the scope of discovery, and the court granted Crisitello's request for information related exclusively to St. Theresa's employees who were pregnant during the period of Crisitello's employment, subject to a confidentiality order. The court denied the remainder of Crisitello's discovery requests.

After the parties exchanged limited discovery, St. Theresa's again moved for summary judgment and to dismiss the complaint. In a November 2016 order, the court granted summary judgment in favor of St. Theresa's, dismissing the complaint with prejudice and determining that a "plain reading of the LAD clearly protects a religious institution, such as St. Theresa's, in requiring that an employee, such as [Crisitello], abide by the principles of the Catholic faith." The court found nothing to suggest that Crisitello was terminated "for her pregnancy or marital status, per se," and held that she was instead terminated for "violating the tenets of the Catholic Church, thereby violating the Code of Ethics and Archdiocese Policies."

In explaining its decision, the court noted that Crisitello's act of revealing her pregnancy to Sister Lee defeated her argument that she was "singled out." The court observed that Crisitello lacked viable comparators because all other pregnant women employed by St. Theresa's were married. Moreover, the court noted that another school within the Archdiocese of Newark -- utilizing the same ministerial policies and code of ethics as St.

8

Theresa's -- had fired an unmarried male employee after learning that he had impregnated his partner. The court declined to entertain Crisitello's "novel suggestion" that, in order to defeat her claim, St. Theresa's should "survey" its employees to discover whether any of them had committed transgressions of the faith. Last, the court found that the First Amendment barred Crisitello's claims, even if the LAD's religious tenets exception did not apply, because secular court involvement here would be an unconstitutional entanglement with religious affairs.

The trial court denied Crisitello's motion for reconsideration.

3.

Crisitello appealed, challenging the trial court's orders denying discovery and reconsideration, and granting summary judgment and dismissal of the complaint. The Appellate Division reversed the orders in an unpublished decision and remanded for further proceedings.

The Appellate Division agreed in principle with the trial court that secular courts cannot decide purely religious disputes, but it found that the dispute at the heart of this case -- which it viewed as whether St. Theresa's asserted reason for termination was pretextual -- was within the bounds of civil jurisdiction. The Appellate Division explained that "when the pretext inquiry neither traverses questions of the validity of religious beliefs nor forces a court

9

to choose between parties' competing religious visions, [it] does not present a significant risk of entanglement." The Appellate Division thus concluded that the First Amendment barred neither Crisitello's claims nor "carefully measured discovery" and proceeded to consider the LAD.

The court interpreted N.J.S.A. 10:5-12(a) to mean that "[d]iscriminatory intent or any other element of an LAD claim cannot be established by a religious institution requiring an employee to follow the tenets of its religion as a condition of employment." The Appellate Division found, however, that the LAD did not bar consideration of this matter under the familiar McDonnell Douglas framework,[2] concluding that Crisitello had made a prima facie case for discrimination under the LAD.

As to the first prong of McDonnell Douglas, the court found that Crisitello had (1) established membership in a protected class -- pregnant

---

[2] In McDonnell Douglas, the United States Supreme Court set forth the framework for proving a case of employment discrimination under Title VII of the Civil Rights Act. 411 U.S. at 802. Under that regime, a plaintiff employee bears the initial burden of establishing a prima facie case of discrimination. Ibid. If the plaintiff does so, the burden shifts to the defendant employer to articulate a "legitimate, nondiscriminatory reason" for the complained-of employment decision. Id. at 802-03. If the defendant provides such a reason, the plaintiff must "be afforded a fair opportunity to show that [the defendant's] stated reason" for the employment decision was "in fact pretext." Id. at 803-05. Our courts apply the McDonnell Douglas framework to employment discrimination claims cognizable under the LAD. See, e.g., Meade v. Township of Livingston, 249 N.J. 310, 328 (2021).

women; (2) proved her qualifications for her position; and (3) suffered an adverse employment action -- termination. The court also found that the circumstances of her firing gave rise to an inference of unlawful discrimination and rejected the trial court's conclusion that Crisitello's nonmarital pregnancy rendered her unqualified for her job. Because St. Theresa's had asserted a nondiscriminatory reason for terminating Crisitello, the Appellate Division turned to the third prong of <u>McDonnell Douglas</u> -- whether that asserted reason was pretextual.

The court explained that whether St. Theresa's asserted reason was pretextual or not required "inquiry into material questions of fact," and that summary judgment was therefore inappropriate at that juncture. The court noted that the lack of evidence before the trial court on summary judgment was "directly attributable" to that court's own discovery limitations. The Appellate Division thus reversed the relevant orders and remanded for discovery as to how St. Theresa's treated similarly situated employees that it knew were in violation of its Code of Ethics.

C.

1.

On remand, the trial court compelled discovery consistent with the Appellate Division's decision. After the close of discovery, St. Theresa's

11

again sought summary judgment. In April 2019, the court heard argument on the motion and again granted St. Theresa's motion for summary judgment, dismissing the complaint with prejudice.

The court explained that "the record is bare of any evidence that even remotely suggests that [Crisitello's pregnancy out of wedlock] is not the real reason for her termination" and noted that Crisitello had not demonstrated that "other single pregnant teachers or [unmarried] male teachers who had impregnated another had not been fired," or "that married teachers who violated the tenets of the Faith were treated differently than single teachers." The court found that Crisitello likewise had not identified any "inconsistency or implausibility" in St. Theresa's explanation. In other words, the court found that Crisitello presented no comparators through which to establish disparate treatment. The trial court also found significant evidence in the record that St. Theresa's supports its married teachers who become pregnant and that another Catholic school, also within the Archdiocese of Newark, fired an unmarried male teacher after he revealed that his girlfriend was pregnant with their child.

Thus, the trial court held on remand that Crisitello failed to show that St. Theresa's "proffered reason [for her termination] was false and that the real reason was motivated by discriminatory intent." The trial court concluded that no reasonable factfinder could rule in Cristello's favor.

12

2.

Crisitello appealed, and the Appellate Division reversed the trial court's judgment, holding that "knowledge or mere observation of an employee's pregnancy alone is not a permissible basis to detect violations of the school's policy and terminate an employee," and reaffirming its earlier determination that Crisitello made a prima facie case of discrimination under the LAD. Crisitello v. St. Theresa Sch., 465 N.J. Super. 223, 227, 238, 242 (App. Div. 2020).

The Appellate Division also distinguished this case from Our Lady of Guadalupe School v. Morrissey-Berru, 591 U.S. ___, 140 S. Ct. 2049 (2020), decided under the First Amendment to the United States Constitution during the pendency of this appeal. The appellate court reasoned that the plaintiffs in Guadalupe performed "vital religious duties" whereas Crisitello did not. Crisitello, 465 N.J. Super. at 235-36. The court also rejected the notion that Crisitello's agreement to serve as an exemplar of the Christian faith and abstain from "immoral conduct" rendered her something other than a lay teacher for purposes of Guadalupe. Id. at 236.

Applying the standard for summary judgment, the Appellate Division explained that a reasonable factfinder could rule in Crisitello's favor. Id. at 237. As for the first step of the McDonnell Douglas framework, the court

13

reiterated its earlier conclusion that Crisitello had stated a prima facie case of discrimination.  Id. at 237-38.  Concerning the second step, the court explained that "assuming the terms of [Crisitello's] employment included an enforceable agreement [that] she would not engage in premarital sex, [St. Theresa's has] satisfied its 'burden of production.'"  Id. at 239.

The court also found that Crisitello satisfied the third prong of McDonnell Douglas.  Id. at 241.  Citing to Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 667 (6th Cir. 1999), and Redhead v. Conf. of Seventh-Day Adventists, 440 F. Supp. 2d 211, 223 (E.D.N.Y. 2006), the Appellate Division explained that an employer cannot rely on the mere observation of a woman's pregnancy to identify instances of premarital sex.  Id. at 240-42. According to the Appellate Division, such a mode of detection is itself evidence of pretext because only women can get pregnant.  Id. at 241.  Here, the Appellate Division noted that St. Theresa's made no effort to discover whether other teachers had engaged in premarital sex or other ethical violations and found that such a lack of investigation raised an issue of material fact as to whether St. Theresa's enforced its policy in a discriminatory manner.  Id. at 241-42.

Further, the Appellate Division ruled that despite Crisitello's concession -- that she knew premarital sex violated the tenets of the Catholic Church --

14

neither the Code of Ethics nor the employee handbook expressly mentioned premarital sex or that it would result in termination. Id. at 242.

D.

Citing the First Amendment to the United States Constitution, St. Theresa's filed a notice of appeal as of right under Rule 2:2-1(a)(1). St. Theresa's also filed a self-described "protective" petition for certification, arguing that its decision to terminate Crisitello's employment was protected under state law. We granted the petition. 246 N.J. 315 (2021).

We also granted leave to appear as amici curiae to the New Jersey Catholic Conference; Agudath Israel of America; the New Jersey Attorney General; the American Civil Liberties Union of New Jersey and the American Civil Liberties Union (jointly, ACLU); the National Women's Law Center, Americans United for Separation of Church and State, "and 26 additional organizations" (collectively, NWLC); and the New Jersey Association for Justice (NJAJ).

II.

A.

St. Theresa's asks us to reverse the Appellate Division. Regarding the LAD, St. Theresa's argues that the statute's religious tenets exception is an affirmative defense that preserves a wall of separation between church and

15

state and exists to relieve religious employers from the burdens of employment litigation. St. Theresa's further argues that if the LAD's religious tenets exception does not mandate dismissal, Crisitello had to show evidence of "disparate treatment" or prove that St. Theresa's asserted reason for her termination was "false, implausible or inconsistently applied." St. Theresa's argues that the Appellate Division's allowed Crisitello to clear a much lower hurdle -- merely showing that St. Theresa's did not affirmatively investigate the conduct of its entire teaching staff to discover other violations of Catholic law.

St. Theresa's also advances constitutional bases for reversing the Appellate Division's decision. First, St. Theresa's claims that the ministerial exception, as most recently explained in Guadalupe, applies to lay teachers with religious duties like Crisitello. In addition to the ministerial exception, St. Theresa's argues that general considerations of church autonomy protect its decision to fire Crisitello because, on these facts, church doctrine is "inextricably linked" with Crisitello's claims and secular adjudication would therefore interfere with religious autonomy.

The Catholic Conference and Agudath Israel support St. Theresa's position and stress that allowing Crisitello's suit to move forward would

16

infringe upon the school's decisions regarding faith, doctrine, and internal governance.

B.

Crisitello argues that this case presents "a factual dispute" as to whether St. Theresa's proffered religious reason for her termination -- engaging in premarital sex -- is pretext for pregnancy and marital-status discrimination in violation of the LAD, and that summary judgment was therefore inappropriate. Specifically, Crisitello notes that other courts have deemed it evidence of pretext for a religious employer to enforce a prohibition on premarital sex based on observations of pregnancy. Crisitello rejects the argument that the ministerial exception applies because, as a lay teacher, she did not perform religious duties as required by Guadalupe. Crisitello asserts that the First Amendment is no obstacle to her claims.

The Attorney General supports Crisitello's view of the applicable laws in this appeal. Regarding the LAD, the Attorney General interprets the religious tenets exception as embracing the traditional burden-shifting framework and submits that this case hinges on whether Crisitello has made a sufficient showing of pretext. The Attorney General claims that because the New Jersey Division on Civil Rights is charged with enforcing the LAD, we should defer to its interpretation of the statute.

17

Turning to the constitutional issues, the Attorney General urges us to reject St. Theresa's views on the ministerial exception because such an interpretation would leave employees of religious institutions without the protection of antidiscrimination law. The Attorney General asserts that "a general expectation that employees exemplify religious values and integrate them into their work is [not] enough to make an employee subject to the ministerial exception" under Guadalupe.

The ACLU contends that the LAD's religious tenets exception does not "permit a religious association to use any . . . protected criteria, apart from religious affiliation, in making employment decisions" and asks us to require that employment agreements "clearly and unambiguously signal" that the plaintiff is surrendering the right to pursue statutory LAD claims in court.

The NWLC and NJAJ likewise support Crisitello's position. They focus on the First Amendment, touching on the LAD only to note that the LAD's religious tenets exception should not be read to exceed the ministerial exception. Additionally, the NJAJ argues that, because this case does not involve an interpretation of religious tenets, St. Theresa's decision to terminate Crisitello is subject to judicial scrutiny, which should be guided by the McDonnell Douglas burden-shifting framework.

## III.

We review the grant or denial of summary judgment de novo and apply the same legal standard as the trial court.  Samolyk v. Berthe, 251 N.J. 73 (2022).  Summary judgment is appropriate "when 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'"  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995) (quoting R. 4:46-2).  Because St. Theresa's moved for summary judgment, we view the evidence in the light most favorable to Crisitello and draw all reasonable inferences in her favor.  See Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 176 (2021).  We owe no deference to conclusions of law that flow from established facts.  State v. Perini Corp., 221 N.J. 412, 425 (2015).

St. Theresa's offers both statutory and constitutional arguments in support of reversal.  We have long instructed that our courts "should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation."  Donadio v. Cunningham, 58 N.J. 309, 325-26 (1971).  Where, as here, there are two independent grounds to dispose of an

appeal -- one statutory and one constitutional -- we will first resolve the statutory issue and address the Constitution only if necessary.

In interpreting a statute, in this case the LAD, our goal is to identify and implement the intent of the Legislature. Smith v. Millville Rescue Squad, 225 N.J. 373, 389 (2016). In doing so, our inquiry starts with the text of the statute itself. Ibid. If the text is unambiguous, our inquiry ends with the text and its ordinary, common-sense meaning controls. See id. at 389-90. We therefore begin with the text of the LAD.

A.

The LAD provides in part that it is unlawful for an employer "to discharge" an employee "because of . . . marital status . . . [or] pregnancy." N.J.S.A. 10:5-12(a). Although the LAD encompasses a wide variety of employment actions, it intentionally, and explicitly, declines to create a cause of action for others, explaining that

> it shall not be an unlawful employment practice . . . for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee . . . .
>
> [Ibid. (emphases added).]

20

As relevant here, N.J.S.A. 10:5-12(a) does two things. First, it identifies certain actions by employers as subject to a cause of action by employees. Second, it approves other actions by employers as lawful and thus exempt from liability. The underscored text -- the LAD's religious tenets exception -- is housed within the section of the statute devoted to protecting certain employment decisions from a cause of action. That placement is significant. See, e.g., Malanga v. Township of West Orange, 253 N.J. 291, 310 (2023) (explaining that courts "look to other parts of the statute for context.").

For employers that are religious associations or organizations, N.J.S.A. 10:5-12(a) thus provides that two types of conduct will not give rise to a cause of action: (1) the use of religious affiliation as a job qualification for "employees engaged in the religious activities" of the organization; and (2) "following the tenets of its religion in establishing and utilizing criteria for employment of an employee."

Because the Legislature thus expressly prescribed an exception to liability under the LAD based on a religious institution's reliance on the tenets of its faith in setting employment criteria, we agree with St. Theresa's that the religious tenets exception is an affirmative defense which must be pled and proven, and the party asserting it carries both the burden of production and persuasion. Stewart v. N.J. Turnpike Auth., 249 N.J. 642, 657 (2022); R. 4:5-

21

3, -4. If the affirmative defense is pled and proven, the employer need not contest the plaintiff's allegations.

Our cases concerning immunity under the Tort Claims Act (TCA) are instructive in this regard. For example, in Nieves v. Office of the Public Defender, we applied the TCA in the context of a public defender faced with a legal malpractice claim. 241 N.J. 567, 580 (2020). Generally speaking, when an attorney breaches a duty of care owed to a client, the attorney is liable for damages proximately caused by the breach. Gilbert v. Stewart, 247 N.J. 421, 442-43 (2021). If that attorney is a public employee, the Tort Claims Act applies. Nieves, 241 N.J. at 580. So, if a public defender is sued for legal malpractice, he can either disprove the plaintiff's factual allegations or demonstrate that he is immune from liability as a public employee under N.J.S.A. 59:2-1. If there is no genuine dispute of material fact concerning the public defender's status for purposes of the TCA, the case can be resolved on summary judgment. See id. at 585 (affirming the grant of summary judgment in favor of a public defender based on TCA immunity).

Similarly, the Consumer Fraud Act (CFA) authorizes one who has suffered an "ascertainable loss" because of another person's "use or employment" of any "method, act, or practice" deemed unlawful under the CFA to recover that loss in an action at law. N.J.S.A. 56:8-19. But we have

recognized that "learned professionals" are exempt from CFA claims stemming from the professional's sales or marketing of services that they are licensed to provide. See, e.g., Macedo v. Dello Russo, 178 N.J. 340, 345-46 (2004) (noting that "learned professionals [are] beyond the reach of the [CFA] so long as they are operating in their professional capacities" and that "advertisements by learned professionals in respect of the rendering of professional services are insulated from the CFA"). Thus, if a learned professional demonstrates that the plaintiff's claims challenge actions or omissions performed in a professional capacity, including the advertisement of professional services, the professional is entitled to judgment as a matter of law when confronted with a claim arising under the CFA. See id. at 342-43 (holding that a CFA complaint brought against a learned professional was properly dismissed); Vort v. Hollander, 257 N.J. Super. 56, 62-63 (App. Div. 1992) (affirming the grant of summary judgment on a CFA claim because the "learned professional" exception applied).

The statute of limitations defense is also "not self-executing" and must be affirmatively raised. Zaccardi v. Becker, 88 N.J. 245, 256 (1982). For example, the Legislature has prescribed that "a construction-defect action must be commenced within six years 'after the cause of any such action shall have accrued.'" The Palisades at Fort Lee Condo. Ass'n, Inc. v. 100 Old Palisade,

23

LLC, 230 N.J. 427, 434 (2017) (quoting N.J.S.A. 2A:14-1). When a defendant builder is sued for a construction defect, he can either argue that the construction was not defective or, if appropriate, raise the statute of limitations as an affirmative defense.

If the builder asserts the statute of limitations, he must show when the cause of action accrued. In the case of construction-defect actions, the cause of action accrues when "the building's original or subsequent owners first knew, or through the exercise of reasonable diligence, should have known of the basis for a cause of action." Id. at 435. If there is no genuine dispute of material fact as to when the alleged defect was discovered, the case can be resolved on summary judgment; the judge need only decide whether it has been six years since accrual. But if the plaintiff raises a genuine dispute of material fact about when the defect was discovered, summary judgment is inappropriate, and the case should proceed. See, e.g., Brill, 142 N.J. at 528-29.

The LAD similarly includes affirmative defenses. In Poff v. Caro, for example, the Law Division considered a complaint brought by the Division of Civil Rights against a property owner who had refused to rent a three-bedroom apartment "because he believed that the three males [seeking to rent the apartment] would likely get AIDS because they were homosexuals" and he

"fear[ed] that his family might be exposed to a terrifying disease." 228 N.J. Super. 370, 378, 380 (Law Div. 1987). Citing N.J.S.A. 10:5-5(n) -- which identifies what the term "real property" encompasses for purposes of the LAD and then states "provided, however, that, except as to publicly assisted housing accommodations, the provisions of this act shall not apply to the rental . . . of a single apartment or flat in a two-family dwelling, the other occupancy unit of which is occupied by the owner as a residence" -- "[t]he landlord contend[ed] that he is exempt from the law against discrimination since he is renting an apartment in a two-family owner occupied house." Id. at 379. Noting that "[t]he facts here indicate that the landlord had turned his premises into a three family not a two family house," the court concluded that the asserted affirmative defense failed and that the landlord was "not exempt from the statute." Ibid.

We see no meaningful distinction between the affirmative defenses created in those settings and the religious tenets exception. In LAD cases where a religious employer invokes the religious tenets exception, the employer must demonstrate that the challenged employment decision relied solely on employment criteria adopted pursuant to the tenets of its religion. If the plaintiff employee fails to raise a genuine dispute of material fact as to whether the challenged employment decision relied solely on the religious

25

tenets of the employer, then the affirmative defense stands as an absolute bar to liability.[3] Of course, when the record reveals questions of material fact regarding whether a religious employer relied exclusively on a plaintiff's violation of a religious tenet in taking adverse employment action against the plaintiff, the matter before the court is not ripe for summary judgment. Brill, 142 N.J. at 528-29.

With those principles in mind, we consider whether St. Theresa's was entitled to summary judgment. We note, as an initial matter, our agreement with the Appellate Division that deciding whether St. Theresa's terminated Crisitello for failing to adhere to the employment criteria St. Theresa's had established "in following the tenets of its religion," see N.J.S.A. 10:5-12(a), is within the court's purview. Determining whether a religious employer's employment action was based exclusively on the tenets of its religion requires application of only neutral principles of law and does not impermissibly entangle the courts in ecclesiastical matters. See McKelvey v. Pierce, 173 N.J. 26, 51-53 (2002).

---

[3] We disagree with the Attorney General's interpretation that the religious tenets exception affords to the employer nothing more than a legitimate, nondiscriminatory reason for an employment action under the McDonnell Douglas framework. If the affirmative defense is pled and proven, the McDonnell Douglas burden-shifting analysis is inapplicable.

B.

Based on the facts of this case, we conclude that St. Theresa's has validly asserted the religious tenets exception as an affirmative defense and that Crisitello has not raised any genuine dispute of material fact regarding the applicability of that defense. We therefore find that St. Theresa's was entitled to summary judgment as a matter of law.

The undisputed evidence of record shows that Crisitello signed two acknowledgment forms that provide:

> My signature below indicates that I have received a copy of the Policies on Professional and Ministerial Conduct adopted by the Archdiocese of Newark; and that I have read and understand those Policies, including the Archdiocesan Code of Ethics, and agree to abide by all of the Policies and the Code of Ethics.

The Code of Ethics, which is the first section of the Ministerial Policies asks that all church personnel[4] "carefully consider each standard in the Code and within the Policies on Professional and Ministerial Conduct before agreeing to adhere to the standards and continue in service to the Archdiocese."

---

[4] The Ministerial Policies define "[c]hurch personnel" to include "The Lay Faithful," which includes "[a]ll paid personnel whether employed in areas of ministry or other kinds of services by the Archdiocese, its parishes, schools or other agencies; also, those who contract their services to Catholic Church agencies," and "[a]ll volunteers."

The Code of Ethics instructs that church personnel "shall exhibit the highest Christian ethical standards and personal integrity" and "conduct themselves in a manner that is consistent with the discipline, norms and teachings of the Catholic Church." The Code of Ethics also recites that "[a]ll Church personnel are required to read and sign the agreement to abide by these policies and the Archdiocesan Code of Ethics." The Ministerial Policies go on to specify that "misconduct includes but is not limited to . . . [i]mmoral conduct," defined as "[c]onduct that is contrary to the discipline and teachings of the Catholic Church."

In a section titled "Standards of the Archdiocese as to Prevention of Immoral Conduct," the Ministerial Policies provide that "[i]t is essential that Church personnel view their own actions and intentions objectively to assure that no observer would have grounds to believe that irregularity in conduct exists. All Church personnel have a responsibility to strive to uphold the standards of the Catholic Church in their day-to-day work and personal lives." The Ministerial Policies further provide that it is "fundamental to the mission of the Archdiocese that Church personnel exhibit the highest ethical standards and personal integrity. The purpose of this policy is to insure that all Church personnel follow the ethical standards of the Catholic Church." That section

28

goes on to provide that church personnel are forbidden from engaging in "[a]dultery, flagrant promiscuity or illicit co-habitation."

St. Theresa's also provided a certification from Deacon John J. McKenna, which explained that

> [o]ne of the tenets of the Roman Catholic Church is that sex outside of the institution of marriage is forbidden. To engage in sex outside of marriage is a sin. It is not consistent with the discipline, norms and teachings of the Roman Catholic Church, i.e. it violates the religious tenets of the Catholic Church.

The religious tenets exception allowed St. Theresa's to require its employees, as a condition of employment, to abide by Catholic law, including that they abstain from premarital sex. Crisitello, a practicing Catholic and graduate of the St. Theresa School, acknowledged that St. Theresa's required her to abide by the tenets of the Catholic faith, including that she abstain from premarital sex, as a condition of her employment. In other words, St. Theresa's required adherence to Catholic law, and Crisitello knowingly violated Catholic law.

The record evidence demonstrates that St. Theresa's consistently maintained its position that Crisitello was terminated for violating Catholic law by engaging in premarital sex. From letters sent to Crisitello after her termination "confirm[ing] that . . . [St. Theresa's] asked [her] to resign [her] position at [the] school for violation of the Code of Professional and

29

Ministerial Conduct of the Archdioceses of Newark"; to Sister Lee's testimony about the meeting in which she informed Crisitello of her termination; to St. Theresa's response to the EEOC charge that "Crisitello was not terminated because of her pregnancy. She was terminated for violation of the Code of Professional and Ministerial Conduct . . . and not following the tenets of the Roman Catholic faith by engaging in sex outside of marriage"; to the position it has taken throughout this litigation, St. Theresa's has remained steadfast in basing its employment action on Crisitello's violation of the terms of her employment as permissibly derived from the tenets of the Catholic faith.

And Crisitello has presented no evidence to counter St. Theresa's asserted position. There is no evidence that St. Theresa's discriminated based on Crisitello's pregnancy. It is undisputed that Sister Lee was unaware of the pregnancy until Crisitello disclosed it while the two negotiated Crisitello's salary and that St. Theresa's did not terminate the employment of any pregnant teachers who were married. There is also no evidence of discrimination with respect to marital status. Crisitello admitted that, long before she became pregnant, it was commonly known that she was unmarried. The record is also clear that St. Theresa's employed both married and unmarried teachers.

The Appellate Division reasoned that the lack of evidence regarding "how male or non-pregnant female teachers . . . who engaged in premarital sex

30

were detected or treated" precluded summary judgment. Crisitello, 465 N.J. Super. at 231. The Appellate Division explained that because only women can become pregnant, it is evidence of pretext for an employer to discipline violations of its ban on premarital sex through observations of pregnancy or fortuitous discovery. Id. at 240-42. Thus, according to the Appellate Division, an ecclesiastical employer cannot lawfully dismiss a member of a protected class for violating requirements of its employment agreement derived from religious tenets unless the employer first determines, following an investigation, that no other employees violated the same or another religious tenet.

We reject the Appellate Division's novel suggestion that Crisitello's firing was evidence of pretext simply because St. Theresa's did not "survey" its employees to discover other transgressions of the faith. Neither the LAD nor our case law requires such an investigation, and we decline to impose this burden.

The difficulty of such a rule is evident when it is applied to a secular employer. For example, if an unmarried, pregnant woman is fired for embezzling money and brings an action under the LAD, she will survive summary judgment by simply asserting that the reason for her termination -- that she was caught embezzling -- is mere pretext for discrimination, unless the

31

employer had already investigated whether there were other instances of embezzlement by married or nonpregnant employees, to rebut the claim of pretext. The fact that St. Theresa's did not survey its employees to discover other transgressions cannot by itself carry the plaintiff's burden of raising a genuine issue of material fact as to a religious employer's affirmative defense based on the LAD's religious tenets exception.

Here, because Crisitello offers no evidence that the reason given for her termination was false, there exists no dispute of material fact and St. Theresa's is entitled to judgment as a matter of law. The religious tenets exception of the LAD precludes recovery here.

Because we decide this matter on the religious tenets exception, we do not reach the constitutional questions presented.

## IV.

We reverse the judgment of the Appellate Division and reinstate the trial court's grant of St. Theresa's motion for summary judgment and dismissal of the complaint.

CHIEF JUSTICE RABNER, JUSTICE PATTERSON, and JUDGE HAAS (temporarily assigned) join in JUSTICE SOLOMON's opinion. JUSTICE PIERRE-LOUIS filed a concurrence. JUSTICES WAINER APTER and FASCIALE and JUDGE SABATINO (temporarily assigned) did not participate.

Victoria Crisitello,

Plaintiff-Respondent,

v.

St. Theresa School,

Defendant-Appellant.

JUSTICE PIERRE-LOUIS, concurring.

Today the majority holds that the religious tenets exception to the Law Against Discrimination (LAD) is an affirmative defense such that once an entity has established that an adverse employment action falls within that exception, the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), does not apply. I disagree with such a broad application of the exception and instead agree with the Attorney General that the religious tenets exception is no more than a means for a sectarian employer to satisfy prong two of the McDonnell Douglas framework.

Applied to this context, the second prong of McDonnell Douglas allows a religious employer to show that the adverse employment action resulted from a lawful nondiscriminatory reason -- in other words, because of a religious tenet. However, a religious employer that has invoked the religious tenets

1

exception, thereby satisfying prong two, is still subject to prong three of the McDonnell Douglas framework, pursuant to which the plaintiff must show by a preponderance of the evidence that the employer's proffered nondiscriminatory reason is a pretext for discriminatory action.

I agree with the majority that plaintiff Victoria Crisitello's LAD action fails, but I depart from the majority's analysis of treating the LAD's religious tenets exception as an affirmative defense such that the McDonnell Douglas framework does not apply. In my view, plaintiff's claim fails because the record does not suggest defendant's proffered religious tenets are a pretext for plaintiff's termination, and therefore, plaintiff has failed to meet her evidentiary burden at step three of the McDonnell Douglas framework. Accordingly, I respectfully concur in the decision.

I.

This Court has on many occasions referenced the Legislature's intent that the LAD's "worthy purpose is no less than eradication of 'the cancer of discrimination' in our society." Richter v. Oakland Bd. of Educ., 246 N.J. 507, 537 (2021) (quoting Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016)). To achieve that goal, "the LAD is given liberal construction, for the 'more broadly [the LAD] is applied, the greater its antidiscriminatory impact.'" Ibid. (alteration in original) (quoting Smith, 225 N.J. at 390).

2

The plain text and legislative history of the LAD, N.J.S.A. 10:5-1 to -49, signal that the Legislature did not intend to create a blanket exception for religious entities to overcome a LAD employment action by merely invoking a religious tenet that justified its decision. In 1945, when the LAD was first enacted, religious employers were not included in the statute's definition of "employer." See L. 1945, c. 169. Thus, the LAD's antidiscrimination principles did not initially apply to religious employers. In 1977, however, the Legislature amended the LAD to broaden the definition of "employer" to include religious entities in order to "remove [the] 'blanket' exemption" for religious employers from the LAD. L. 1977, c. 122; see Statement to S. 1608 (Nov. 8, 1976) (Senate Statement). This amendment likewise created the religious tenets exception.

A detailed review of the text of N.J.S.A. 10:5-12 is instructive in interpreting the manner in which the Legislature chose to articulate the discriminatory actions that fall within the LAD and those that do not. After an introductory clause that declares "[i]t shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination," N.J.S.A. 10:5-12 sets forth a list of practices declared unlawful if based on protected characteristics such as race, age, sexual orientation, marital status, and

3

pregnancy. The statute then lists exceptions to that general rule. One exception is the religious tenets exception, which states

> it shall not be an unlawful employment practice . . . for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee . . . .
>
> [N.J.S.A. 10:5-12(a).]

The exception makes otherwise discriminatory actions <u>nondiscriminatory</u> -- if the entity took the action in "following the tenets of its religion in establishing and utilizing criteria for employment of an employee." <u>Ibid.</u> Significantly, in the Senate Statement accompanying the bill amending the statute, the Legislature noted that "[a]ny other [prohibited] basis for selection is unlawful."[1] In other words, if the basis for the apparently discriminatory

---

[1] Defendant St. Theresa School argues, in line with the majority's holding, that a proffered religious tenet basis for an adverse employment action is not "subject to a determination of whether the stated reason for the discharge was merely pretext for unlawful discrimination." But defendant further contends that "any asserted factual dispute in this case is immaterial." Given the LAD's remedial purpose of eradicating discrimination, it is unlikely that the Legislature intended for religious employers to simply invoke their religious tenets as the basis for adverse action with no further inquiry into whether the action was actually motivated by discriminatory intent.

4

employment action is something other than the employer's religious tenets, the action falls within the LAD's prohibitions and is unlawful.

By way of example, if a secular employer takes an adverse employment action based on an employee's marital status or pregnancy, that is very clearly an unlawful employment action under the LAD. If a religious employer, however, takes the same action, but the employer asserts that the action was based on following its religious tenets, it is not an unlawful employment action or unlawful discrimination. In other words, the exception transforms a discriminatory and unlawful action into nondiscriminatory action by virtue of the religious tenet undergirding the conduct. This is true unless, of course, the proffered religious tenet motive is proven to be a pretext for discriminatory action.

## II.

The LAD provides a cause of action for aggrieved employees to file suit against their employers if they believe their employer committed an adverse employment action against them based on a protected characteristic. In the rare employment discrimination case in which a plaintiff presents direct evidence of an employer's discriminatory animus, the McDonnell Douglas framework, elaborated upon below, does not apply. In those cases involving direct evidence of discrimination, "the employer must . . . produce evidence

5

sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision." Smith, 225 N.J. at 395 (quoting Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 100 (2000)).

Routinely, employment discrimination complaints under the LAD are assessed using the "procedural burden-shifting methodology" set forth in McDonnell Douglas, which allows a plaintiff to use circumstantial evidence to establish a claim of discrimination against their employer. Meade v. Township of Livingston, 249 N.J. 310, 328 (2021) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)). Under that framework,

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant must then show a legitimate nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.
>
> [Ibid. (quoting Henry v. Dep't of Hum. Servs., 204 N.J. 320, 331 (2010)).]

The first prong of McDonnell Douglas requires the plaintiff to state a prima facie case of discrimination. Ibid. "A plaintiff alleging discriminatory discharge must show: '(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job.'" Smith, 225 N.J. at 395 (quoting

6

Victor v. State, 203 N.J. 383, 409 (2010)).  At this stage, the plaintiff's evidentiary burden is "rather modest:  it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent -- i.e., that discrimination <u>could</u> be a reason for the employer's action."  <u>Zive</u>, 182 N.J. at 447 (quoting <u>Marzano v. Comput. Sci. Corp. Inc.</u>, 91 F.3d 497, 508 (3d Cir. 1996)).

Once a prima facie case of discrimination is established, prong two of <u>McDonnell Douglas</u> gives the employer an "opportunity to rebut the presumption of discrimination 'with admissible evidence of a legitimate, non-discriminatory reason for its rejection of the employee.'"  <u>Smith</u>, 225 N.J. at 395 (quoting <u>Bergen Com. Bank v. Sisler</u>, 157 N.J. 188, 210 (1999)).

"If the employer [succeeds] in rebutting the presumption of discrimination, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's proffered reason for the termination was in fact a pretext for discrimination" -- prong three of <u>McDonnell Douglas</u>.  <u>Id.</u> at 395-96 (citing <u>Sisler</u>, 157 N.J. at 211).  To prove that the employer's reason is pretext, "a plaintiff must do more than simply show that the employer's [proffered legitimate, nondiscriminatory] reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent."  <u>Viscik v. Fowler Equip. Co.</u>, 173 N.J. 1, 14 (2002).

7

"Employees typically try to establish pretext in one of three ways: (1) by showing that the employer's articulated reason had no basis in fact; (2) by showing that the reason would have been insufficient to motivate the employer's action; or (3) by showing that the reason did not actually motivate that action." Blount v. Stanley Eng'g Fastening, 55 F.4th 504, 510 (6th Cir. 2022) (quotation omitted).

A series of hypothetical examples is helpful in assessing the bounds of the McDonnell Douglas framework with respect to LAD claims against both secular and religious employers. Expanding on the examples above, if a secular employer admits that it fired an employee because she became pregnant, that is clearly an unlawful employment action under the LAD. The McDonnell Douglas framework would not apply because the plaintiff-employee has direct evidence in the form of an admission that the employer has violated the LAD in firing her.

However, if a plaintiff does not have direct evidence of discrimination and claims that her secular employer fired her because of her pregnancy, McDonnell Douglas does apply and the plaintiff would likely meet the "rather modest" evidentiary burden under prong one of McDonnell Douglas by presenting a factual scenario "compatible with discriminatory intent." Zive, 182 N.J. at 447. Then, if the employer submits that it fired that same

8

employee for poor performance and provides evidence to support that assertion, the employer would satisfy prong two of <u>McDonnell Douglas</u> by providing a legitimate, lawful, nondiscriminatory reason for the termination. Prong three of <u>McDonnell Douglas</u> is then implicated; to survive summary judgment, the plaintiff must prove by a preponderance of the evidence that the asserted lawful reason is merely a pretext for a discriminatory motive, that is, the plaintiff was actually fired because of pregnancy, despite the employer's assertions.

The same would be true if a religious employer asserts that it fired an employee for poor performance -- that is, a legitimate, lawful, nondiscriminatory employment reason to terminate an employee. But if the plaintiff alleges that their race was the actual reason for their firing, prong three of the <u>McDonnell Douglas</u> burden-shifting framework would certainly allow the plaintiff to present evidence of pretext to establish that the termination was racially motivated.

The analysis is no different when the religious tenets exception is invoked. As applicable to this case, if a religious employer asserts that it fired an employee for her pregnancy, which violates the religious tenets of the employer's faith because the employee was unwed and had therefore engaged in premarital sex, that serves as a religious employer's legitimate, lawful,

9

nondiscriminatory reason for the termination under the religious tenets exception. But just as in <u>every other scenario</u> when an employer proffers a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must then be allowed to prove by a preponderance of the evidence that the employer's asserted lawful motive is merely a pretext for a discriminatory reason. If a plaintiff in such a situation had emails, for example, in which the employer seemingly expressed displeasure in having a pregnant woman on staff, apart from the religious tenets basis, that would be sufficient to show pretext. Such evidence would show that although the employer asserted the religious tenets of their religion, that was a cover for the real reason -- discrimination against a pregnant employee.

### III.

The majority holds that once a defendant has "pled and proven" the religious tenets exception, "the <u>McDonnell Douglas</u> burden-shifting analysis is inapplicable," and the general summary judgment standard of determining whether a genuine issue of material fact exists is triggered. <u>Ante</u> at ___ (slip op. at 25, 26 n.3).[2] Our courts, however, have consistently applied the

---

[2]  The majority also states that if the religious tenets "affirmative defense is pled and proven, the employer need not contest the plaintiff's allegations." <u>Ante</u> at ___ (slip op. at 22). That statement seems to be in line with defendant's argument that once the religious tenets exception is established,

10

McDonnell Douglas framework "to determine the proofs necessary to establish [a plaintiff's] LAD claim and whether summary judgment was appropriately granted" or denied. Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-30 (2017) (assessing the summary judgment standard through the McDonnell Douglas framework); see also Meade, 249 N.J. at 330-32 (finding summary judgment improper after analyzing the facts of the case pursuant to the McDonnell Douglas burden-shifting framework); Henry, 204 N.J. at 332 ("[I]f the plaintiff cannot meet his or her obligation under the McDonnell Douglas methodology, the employer will prevail on summary judgment."); Sisler, 157 N.J. at 208-10, 217-18 (finding summary judgment improper and noting that "this Court has adopted the McDonnell Douglas approach 'as a starting point' in analyzing claims under the LAD"); El-Sioufi v. Saint Peter's Univ. Hosp., 382 N.J. Super. 145, 166-75 (App. Div. 2005) (finding summary judgment appropriate because the plaintiff failed to establish pretext and the evidence was overwhelming that the adverse employment actions taken against her were based on legitimate, nondiscriminatory reasons); Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 303-08 (App. Div. 2000) (finding summary judgment appropriate because the plaintiff failed to carry his burden to show

_____

that ends the inquiry and the case, despite the majority's holding that a plaintiff can survive summary judgment if a genuine dispute of material fact exists.

that the defendant's legitimate, nondiscriminatory reason for his termination was pretextual). The manner in which our trial courts determine whether summary judgment is appropriate in LAD matters is thus to conduct the burden-shifting analysis.

The goal of the McDonnell Douglas burden-shifting analysis is to effectuate the purpose of LAD by allowing courts to assess claims through a framework that challenges the veracity of the employer's proffered reason. See Herx v. Diocese of Fort Wayne-South Bend Inc., 48 F. Supp. 3d 1168, 1180 (N.D. Ind. 2014) (finding that, in the context of the Americans with Disabilities Act (ADA)'s religious tenets exception, the plaintiff was "entitled to a chance to show," under prong three of McDonnell Douglas, that the employer's "proffered justification wasn't its true reason for nonrenewing her contract -- that her infertility was"). Indeed, at the heart of every LAD claim is the allegation that the motivation behind an adverse employment action was discriminatory.

The majority's conclusion that the religious tenets exception is an affirmative defense -- similar to other affirmative defenses that end the case once proven -- is contrary to the Legislature's decision to subject religious employers to the LAD's antidiscrimination principles. And the majority's comparison to other statutes' affirmative defenses in support of this holding is

12

not dispositive because the LAD's liberal, remedial intent does not lend itself to comparison to dissimilar statutes. See, e.g., Fuchilla v. Layman, 109 N.J. 319, 332-38 (1988) (holding the notice provisions of the Tort Claims Act (TCA) did not apply to LAD actions, as the purposes of the two statutes are different); Victor, 203 N.J. at 410 n.11 (noting that the statutory definitions for disability under the LAD are "significantly broader than those in the ADA").

Though the majority is correct that the LAD includes an affirmative defense in another context, the rental of "real property," that provision's language explicitly expresses the Legislature's intent to limit the LAD's protections to specific rental properties, as opposed to the language contained in the religious tenets exception which is stated much differently. Compare N.J.S.A. 10:5-5(n) ("the provisions of this act shall not apply to the rental of . . ." (emphasis added)), with N.J.S.A. 10:5-12(a) ("it shall not be an unlawful employment practice . . ." (emphasis added)). It is evident that the language of N.J.S.A. 10:5-5(n) signals an affirmative defense that once established ends the case.

In Poff v. Caro, in which a three-family home property owner refused to rent an apartment due to his discriminatory beliefs against gay men, the Law Division concluded that N.J.S.A. 10:5-5(n) did not shield the owner from liability because the statute exempted two-family -- not three-family -- homes

13

from liability under the LAD.  228 N.J. Super. 370, 378-79 (Law Div. 1987).

However, if the property owner did in fact occupy and rent a two-family home,

N.J.S.A. 10:5-5(n)'s affirmative defense would apply and shield the owner

from liability, <u>regardless</u> of any overtly discriminatory animus of the owner.

In other words, even if the tenants in <u>Poff</u> had direct evidence of

discrimination or could prove pretext, they nevertheless could not survive

summary judgment.  That is very different from the contours of the majority's

asserted religious tenets affirmative defense, pursuant to which, if the

employee can prove pretext, the employee could potentially survive summary

judgment due to asserting a genuine dispute of fact.

Furthermore, the other affirmative defenses that the majority cites

operate differently in practice than the articulated religious tenets defense

would.  In the TCA example, once the affirmative defense is established that

the defendant is immune from liability based on his status as a public defender,

that is the end of the case, unless there is a genuine issue of material fact

concerning the defendant's status for immunity.  <u>See</u> <u>ante</u> at ___ (slip op. at

22).  Similarly, in the statute of limitations example, the majority notes that if

there is a genuine dispute of material fact as to when the action accrued for

purposes of calculating the statute of limitations, summary judgment is

inappropriate.  <u>See</u> <u>ante</u> at ___ (slip op. at 23-24).  In both of those scenarios,

14

the potential genuine issues of material fact that would preclude summary judgment relate to the <u>applicability</u> of the affirmative defense in the first instance -- whether the defendant was a public defender or whether the statute of limitations date has passed -- <u>not</u> to the merits of the case. That is a very meaningful distinction between those affirmative defenses and the majority's articulated religious tenets affirmative defense.

The majority instructs that if a genuine dispute of material fact exists as to whether the employer relied solely on its religious tenets in justifying the adverse action, summary judgment is improper. <u>See</u> <u>ante</u> at ___ (slip op. at 25-26). This necessarily instructs trial courts to analyze the merits of the plaintiff's claim to decipher whether the employer's proffered reason is true, or a pretext for unlawful discrimination. Because of this, even if the religious tenets exception is applicable, pled, and proven, a plaintiff can still defeat the employer's motion for summary judgment. By contrast, if parties stipulate that the statute of limitations has passed and therefore that defense applies, the case is over. As noted, if a property owner refuses to rent an apartment in their two-family home for discriminatory reasons and raises the affirmative defense found in N.J.S.A. 10:5-5(n), the case is over. The inquiry into whether an employer's proffered reason for an adverse employment action is pretextual is not the same as the mechanical application of whether an event occurred on a

15

particular date, like in the statute of limitations context, or whether a rental property is a two-family or three-family home, like in Poff. Such a construct that searches the merits of the LAD claim is unlike the other affirmative defense the majority cites.

Additionally, the Court's holding replaces the McDonnell Douglas burden-shifting methodology with the general summary judgment standard when a religious entity has invoked the religious tenets exception. Ante at ___ (slip op. at 25-26). I see no reason for this change. The majority articulates that when there are "questions of material fact regarding whether a religious employer relied exclusively on a plaintiff's violation of a religious tenet in taking adverse employment action against the plaintiff, the matter before the court is not ripe for summary judgment." Ante at ___ (slip op. at 26). That is almost the same inquiry found within prong three of McDonnell Douglas: shifting the burden back to the plaintiff to establish by a preponderance of the evidence that the employer's proffered reason (whether based on a religious tenet or otherwise) is pretext for discriminatory action. Taking the same inquiry that our courts have been applying for decades and removing it from the paradigm of the McDonnell Douglas framework will do nothing but cause confusion among the trial courts regarding the proper method of analyzing whether a case under the LAD has been established when the religious tenets

16

defense has been proffered. Doing so departs from our case law which has clearly established that the proper way to assess summary judgment in LAD cases involving circumstantial evidence of discrimination is through the McDonnell Douglas framework.

The Court opines that genuine disputes of material facts will prevent summary judgment in these LAD cases. In the general summary judgment context, outside the three-step burden-shifting of McDonnell Douglas, courts "must accept as true all the evidence which supports the position of the party defending against the motion and must accord him [or her] the benefit of all legitimate inferences which can be deduced therefrom." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995) (alteration in original) (quoting Lanzet v. Greenberg, 126 N.J. 168, 174 (1991)). A plaintiff's allegations of discrimination thus must be viewed in the light most favorable to her and the court must draw all reasonable inferences in her favor. Id. at 540; Winberry Realty P'ship v. Borough of Rutherford, 247 N.J. 165, 176 (2021).

By circumventing the McDonnell Douglas framework, the Court has seemingly created a lesser burden for plaintiffs to sustain a discrimination claim against their religious employers. That is, plaintiffs who were once subject to the preponderance of the evidence standard under prong three of McDonnell Douglas are now able to sustain their claim if they raise a genuine

17

issue of material fact as to whether their employer relied solely on its religious tenets in commencing the adverse employment action, an inquiry viewed in the light most favorable to the plaintiff. If a plaintiff has any credible evidence that their religious employer did not solely rely on its religious tenets, now summary judgment would seemingly be improper. Conversely, prong three of McDonnell Douglas instructs that such limited proof is not enough to sustain a LAD claim; to prove pretext, a plaintiff "must also demonstrate that the employer was motivated by discriminatory intent." Viscik, 173 N.J. at 14.

In light of the Court's holding, there is no clear framework for trial courts to examine whether the religious tenets basis for the adverse employment action was pretextual. My concern, going forward, is that taking this LAD inquiry outside the well-established burden-shifting methodology and treating the religious tenets exception as an affirmative defense similar to a statute of limitations is contrary to the Legislature's intent and will have the unintended result of needlessly confusing trial courts, or worse, dismissing worthy claims in which evidence of pretext exists. There is no principled reason for restructuring the manner in which LAD claims are assessed after decades of this type of analysis pursuant to McDonnell Douglas for this one class of employers.

18

IV.

Applying the <u>McDonnell Douglas</u> framework to this case, plaintiff must first establish a prima facie case of discriminatory discharge. Plaintiff's burden at this stage is "rather modest" -- she merely needs to show that "discrimination <u>could</u> be a reason for the employer's action." <u>Zive</u>, 182 N.J. at 447 (quoting <u>Marzano</u>, 91 F.3d at 508). It is not disputed that (1) plaintiff's pregnancy places her in a protected class, (2) that she was otherwise qualified and performing the essential functions of the job, (3) that she was terminated, and (4) that after her termination, defendant sought similarly qualified individuals for that job. <u>See</u> <u>Victor</u>, 203 N.J. at 409. Plaintiff's claim that defendant fired her after she disclosed that she was pregnant sufficiently alleges that discrimination could have been a reason for the termination.

Turning to prong two, defendant has carried its burden and proffered a legitimate, lawful, nondiscriminatory reason for plaintiff's termination by invoking the religious tenets as a reason for the adverse action. Even plaintiff conceded that she was aware that premarital sex violated the tenets of the Catholic Church.

The main dispute in this case centers around prong three -- whether plaintiff has carried her burden of showing that defendant's asserted religious tenet is merely a pretext for discrimination. Plaintiff does not present any

19

evidence that she was discriminated against, or fired, for being pregnant unrelated to defendant's proffered religious tenets. Plaintiff similarly provides no evidence that defendant's proffered reason for her termination is false. Additionally, the evidence does not suggest disparate treatment; to the contrary, the firing of a male employee at another school within the Archdiocese of Newark for the same reason -- premarital sex, which resulted in a child out of wedlock -- shows that the Archdiocese at large is relying on their religious tenets to make these decisions.

In past cases in which our courts found sufficient evidence of unlawful pretext to withstand summary judgment, those plaintiffs put forth more evidence to carry their burden. See Meade, 249 N.J. at 331 (where the plaintiff submitted evidence of gender-based comments from councilmembers who voted to terminate her, including comments that a male subordinate took issue with reporting to a woman and that "Michele [Meade] would not be having this problem if her name was Michael"); DeWees v. RCN Corp., 380 N.J. Super. 511, 529-31 (App. Div. 2005) (where the plaintiff submitted evidence of (1) reassignments of poor-performing younger men within the company instead of terminations, (2) hostile interactions with her male supervisor, (3) sexist comments made by the company's male president, and (4) her employer's

20

attempts to reduce her bonus and change her stock option terms without considering similar actions for male executives).

Based on the evidence in the record, plaintiff has failed to establish, by a preponderance of the evidence, pretext for the adverse action in this case. Therefore, I believe that plaintiff's LAD action fails under prong three of McDonnell Douglas, and therefore summary judgment is appropriate for defendant.

V.

For those reasons, I respectfully concur.